[Cite as *State v. Wright*, 2017-Ohio-1225.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No. L-16-1053

        Appellee                                Trial Court No. CR0201501877

v.

Cedric Wright                                        **DECISION AND JUDGMENT**

        Appellant                                Decided:  March 31, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Claudia A. Ford, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury verdict, defendant-appellant, Cedric Wright, appeals the

March 11, 2016 judgment of the Lucas County Court of Common Pleas.  For the

following reasons, we affirm the trial court judgment.

## I.  Background

{¶ 2} Cedric Wright and Michael Dodson were cellmates at the Toledo Correctional Institution ("TCI") in Lucas County, Ohio.  Wright was serving time for murder, and Dodson for attempted murder.  On October 6, 2013, Wright assaulted Dodson inside their cell.  Dodson died the next day from the injuries sustained in that assault.

{¶ 3} On May 29, 2015, Wright was charged with one count of purposeful murder, a violation of R.C. 2903.02(A), and one count of murder resulting from the commission of a first-degree offense of violence, a violation of R.C. 2903.02(B).  The case was tried to a jury beginning March 8, 2016.

{¶ 4} The state presented testimony from a number of witnesses, including the corrections officers and other law enforcement officials who responded to or investigated the incident.  According to those witnesses, Wright and Dodson approached Corrections Officer Rebecca Cairl at around 9:30 a.m. on Sunday, October 6, 2013, and said that they no longer wished to live in the same cell.  Wright asked if they could be separated.  Officer Cairl passed along their inquiry, but was told that nothing could be done until Monday.  She described that Wright appeared agitated and angry, and Dodson appeared frightened.  He was looking down and did not make eye contact.

{¶ 5} Less than an hour later, Officer Cairl was patrolling the day room, a common area available to the inmates during designated hours.  She heard Dodson yell for help from his cell.  She could see that he was on the ground and Wright was on top of

2.

him. She pressed an emergency "man-down" button on her belt to signal for back up, and she ran up a short flight of stairs to Dodson and Wright's cell.

{¶ 6} As Officer Cairl approached the cell, Wright stood up. She grabbed Wright's arm, but he overpowered her and pushed her out the doorway into the hall. He slammed the cell door shut and said to Officer Cairl either "I'm not done with this bitch yet," or "Bitch, I'm not done with him."

{¶ 7} Officer Cairl attempted to open the door with her key, but it would not open. It was apparently common for inmates at TCI to place items, such as batteries, in the locks. This enabled them to close their doors without being locked in or locked out of the cell. Officer Cairl discovered that is what had happened here. Wright had placed a battery in the lock. When he slammed the door closed, it became jammed and Cairl's key would not work. The door to the cell was solid, except for a window and a cuff port. Unable to get into the cell, Officer Cairl sprayed pepper spray through the cuff port.

{¶ 8} Other officers arrived at the cell. Through the window and the cuff port, they could see that Dodson was lying on the ground motionless with his feet near the door. Wright was sitting on top of him, with his back to the door, punching him, choking him, and slamming his head against the floor. They gave Wright verbal commands to stop, and they sprayed additional pepper spray into the cell. At one point, Lieutenant Paul Huntzinger and Officer Cairl saw Wright get up, walk to the bunkbeds, then return to Dodson to resume assaulting him. He seemed unaffected by the pepper spray.

3.

{¶ 9} After a few minutes, then-Lieutenant (now-Captain) Peter Kimball was able to signal to the control room to release the door. He pulled it open, and Lieutenant Huntzinger ran inside, but became overwhelmed by the pepper spray. Captain Kimball went in and pulled Wright out by the back of his pants. Wright was handcuffed and taken to the segregation unit. He did not require immediate medical attention.

{¶ 10} Prison nurses arrived at the cell to render aid to Dodson. They could not immediately get into the room, however, because of the pepper spray. The officers ultimately dragged Dodson out of the cell by his feet, leaving a trail of blood as they pulled him into the hallway.

{¶ 11} Dodson was unresponsive. He had a pulse, but he was barely breathing. He was making rattling, gurgling noises. An ambulance was called, and Dodson was transported to St. Vincent Hospital. He died the next morning. The deputy coroner testified that Dodson's cause of death was blunt head and neck injury, and she ruled the death a homicide. Dodson had sustained several rib fractures, facial fractures, fractures of his hyoid bone and thyroid cartilage, and fractures of bones in his mouth and nasal cavity. He suffered severe abrasions to his scalp and face; contusions to his right frontal lobe, lips, tongue, and oral mucosa; severe cerebral edema; and bleeding in the right temporalis muscle and in multiple strap muscles in the neck. A tooth was knocked out and was recovered from his throat.

{¶ 12} Trooper Kent Stambaugh, of the Ohio State Highway Patrol, was assigned to investigate Dodson's murder. He met with the prison investigator, reviewed the prison

4.

surveillance video, visited St. Vincent Hospital, and interviewed numerous witnesses, including Wright, another inmate from the cellblock, and several responding officers.

{¶ 13} Trooper Stambaugh testified about his interview of Wright. He stated that Wright's eyes were very red, but otherwise he appeared uninjured. He said that Wright's demeanor was lethargic and Wright was sometimes slow to answer, but was responsive overall. Wright told Trooper Stambaugh that people had been going after him and Dodson because Dodson owed money for drugs. Wright was upset about this, and he and Dodson got into an argument. Dodson told Wright that he should just move out. They went to Officer Cairl and asked if they could be assigned to different cells, but were told that they would have to wait until the next day. They returned to their cell.

{¶ 14} Wright told Trooper Stambaugh that Dodson left the cell for a while, and Wright began packing his things. He said that when Dodson returned, he was cleaning a bowl in the sink and had his back to the door.[1] Wright claimed that Dodson came at him with a piece of metal and he tried to grab it out of Dodson's hand. He showed Trooper Stambaugh a superficial scratch between his middle finger and ring finger on his right hand, but he did not remember how he sustained that scratch.

{¶ 15} Wright maintained that after his initial altercation with Dodson, "things got blank" and he could not remember what happened. He said that it was cloudy, like being in a dream. He described that "everything was red" and he could not grasp what was

---

[1] Photos of the cell show a bowl in the sink.

5.

going on.  He claimed that at one point, he thought he was in the prison rec room, but that did not seem right because he could hear people hollering at him to stop.

{¶ 16} Trooper Stambaugh told Wright that Dodson was "messed up pretty bad" and reminded him that he and Dodson were the only two people in that cell.  Wright then acknowledged that they may have ended up on the ground wrestling—which he later recanted—and he recalled the sound of spraying and people telling him to stop.  He said that he did not remember pulling the door shut, but he admitted that he had placed a battery in the door, and was aware that when the door is slammed shut with a battery jammed inside, it is hard for the guards to open it.  He explained that it is common for inmates to put batteries in the doors to keep them from latching shut.

{¶ 17} Wright told Trooper Stambaugh that he and Dodson had been cellmates for over a year, and he claimed that they got along well.  He said that they had no previous altercations, and he never indicated that he was afraid of Dodson.  Wright explained that Dodson would pay for drugs, such as heroin and Ativan, and they would both use them. The two had taken pills the night before, but he denied that he was under the influence of drugs at the time of the beating.[2]  He said only that he was cloudy from everything that had happened and because of the pepper spray.

{¶ 18} According to Wright, other inmates were pressuring him to get Dodson to pay up, but he denied being pressured to hurt Dodson.  He claimed that he would never

---

[2] Toxicology results reported in the coroner's findings indicate that heroin and morphine were found in Dodson's urine, but not in his blood.

hurt Dodson like that. Wright relayed that a couple of weeks before the incident, an inmate came to their cell to collect money from Dodson and he struck Dodson. Wright said that he beat up the other inmate after this happened. It seemed to Trooper Stambaugh that Wright cared for Dodson. Wright said that "if he had done anything to [Dodson,] it had to be something that would have really ticked him off." He explained that he has anger issues and that he gets so angry that he does not recall what happens after that.

{¶ 19} To determine whether Wright had been injured in the altercation, Trooper Stambaugh asked him to remove his shirt and pull up the legs of his shorts. He observed the scratch between Wright's fingers, and he saw that the knuckles on his right hand were swollen and the knuckles on his left hand appeared red. There was an old scar on Wright's left shoulder blade, but no fresh injuries. Wright complained that his whole body hurt, but not from being struck or stabbed. His back area and the back of his biceps were a little red, but that was from the pepper spray.

{¶ 20} Trooper Stambaugh examined Wright's belongings which had been placed in a vault. Among them was a metal strip, approximately six inches long, one-half of an inch wide, and one-sixteenth of an inch thick. He described the metal strip as a shiv or shank that would be used in prison as a weapon. Wright said that he did not recognize the metal strip. Trooper Stambaugh submitted it for blood and DNA analysis. Ultimately, another inmate's DNA was found on the metal, but neither Dodson's nor Wright's DNA was present.

7.

{¶ 21} At a second interview with Trooper Stambaugh, Wright stated that there had been two metal strips in his cell but that Dodson was supposed to have thrown both of them away before that day. A second piece of metal was never found. Wright said that the metal strip, which he described as having come from a notebook, had been wrapped in a stocking, and that he recalled reaching for the metal strip and it went in between his fingers.[3] At some point, Trooper Stambaugh mistakenly indicated that he saw the metal strip in Wright's cell; he clarified, however, that he first saw it when he viewed Wright's belongings.

{¶ 22} In addition to the testimony presented, the state also offered into evidence video surveillance from the cellblock. The recording is of good quality, and several witnesses identified the various people depicted in the video. In it, Dodson and Wright can be seen in the cell and it is apparent that they are engaged in a scuffle. Wright closes the door, but shortly after that, the door is kicked open. Another inmate ascends the stairs, shuts the door, and then descends the stairs. About a minute later, the door is kicked open again and someone can be seen lying on the ground. Officer Cairl runs up the stairs and tries to enter the cell. Wright pushes her out. Officer Cairl then struggles to open the door. Additional officers arrive on the scene, and they too struggle to open the door. Captain Kimball waves and soon after, the door opens. Lieutenant Huntzinger walks into the cell and then exits immediately. Captain Kimball grabs Wright and pulls

---

[3] Trooper Stambaugh testified that when Wright said this, he pointed at his ring finger and pinky finger; however, the cut was between his middle finger and ring finger.

8.

him through the door. Wright is handcuffed and dragged away. About four minutes later, nurses arrive at the cell. Officers drag Dodson out, and the nurses attempt to administer aid to him. He is then placed on a backboard and carried down the stairs.

{¶ 23} The jury acquitted Wright on Count 1 of the indictment, purposeful murder, but convicted him of Count 2, causing Dodson's death during the commission of a felony in violation of R.C. 2903.02(B). The matter immediately proceeded to sentencing, and the trial court ordered Wright to serve a term of life in prison with the possibility of parole in 15 years. This sentence was memorialized in a judgment entry journalized on March 11, 2016. Dodson appealed, and he assigns the following errors for our review:

Assignment of Error One: The jury instructions for the affirmative defense of self-defense were given in plain error.

Assignment of Error Two: Trial counsel rendered ineffective assistance of counsel in violation of appellant's Sixth Amendment right to counsel by failing to object to the lack of common law Castle Doctrine instructions.

Assignment of Error Three: Appellant's convictions are against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 24} Wright's three assignments of error all revolve around his contention that he killed Dodson in self-defense, and the jury was not properly instructed on this defense. We consider each of Wright's assignments of error in turn.

9.

## A. Jury Instructions on the Affirmative Defense of Self-Defense

{¶ 25} At trial, Wright claimed that Dodson attacked him and that he was merely defending himself when he killed Dodson. He requested that the jury be instructed on the affirmative defense of self-defense. While the court provided a self-defense instruction to the jury, Wright contends that the instruction was incomplete or inaccurate. This is the basis for Wright's first assignment of error.

{¶ 26} Wright failed to raise this challenge in the trial court, therefore we review his assignment of error under a plain-error standard. Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.,* citing *Long* at paragraph two of the syllabus.

{¶ 27} To establish self-defense the defendant must prove (1) that he was not at fault in creating the situation; (2) that he had reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm and that his only means of escape from such danger was by the use of deadly force; and (3) that he did not violate any duty to escape to avoid the danger. *State v. Jackson*, 22 Ohio St.3d 281, 283, 490 N.E.2d 893 (1986). "If the defendant fails to prove *any one* of these elements by a

10.

preponderance of the evidence he has failed to demonstrate that he acted in self-defense."
*Id.* at 284.

{¶ 28} In establishing whether the defendant had reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm, the jury must put itself in the position of the defendant and consider all of the defendant's characteristics, knowledge or lack of knowledge, circumstances, history, and conditions at the time of the attack, as well as the conduct of the alleged assailant, and decide if the alleged assailant's acts and words caused the defendant to reasonably and honestly believe that he was about to be killed or suffer great bodily harm. *State v. Thomas*, 77 Ohio St.3d 323, 330-331, 673 N.E.2d 1339 (1997). The defense of self-defense is not available if the defendant used more force than was reasonably necessary and if the force used was greatly disproportionate to the apparent danger. *State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 8.

{¶ 29} Wright's challenge to the trial court's self-defense instruction centers around the "duty to retreat" element and the court's failure to incorporate what is known as the "castle doctrine." Under the common law "castle doctrine," a defendant has no duty to retreat from his home. *Thomas* at 327. The castle doctrine is now codified in R.C. 2901.09(B)[4] which provides, in pertinent part, that "a person who lawfully is in that

---

[4] In its brief, the state fails to cite R.C. 2901.09(B); it instead cites R.C. 2901.05(B). R.C. 2901.05(B)(1) creates a presumption of self-defense—i.e., a presumption that all *three* elements of the defense are satisfied—where "the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or

11.

person's residence has no duty to retreat before using force in self-defense." *State v. Suarez*, 2d Dist. Greene No. 10CA0008, 2011-Ohio-1438, ¶ 11-12.  The Supreme Court of Ohio has held that the castle doctrine may apply even where (1) the defendant and the alleged assailant are cohabitants of the residence, and (2) the "residence" is a jail cell and the defendant and alleged assailant are cellmates.  *See Thomas* at 327; *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 74.

{¶ 30} Disregarding R.C. 2901.09(B), the trial court provided the following instruction about the duty to retreat:

Duty to retreat:  The Defendant had a duty to retreat if he did not have reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, or that he had a reasonable means of escape from that danger other than by the use of deadly force.  No duty to retreat:  The defendant no longer has a duty to retreat if, one, he reasonably indicated his intention to retreat from the situation and no longer participate in it.  And, two, he had reasonable grounds to believe and an honest belief that he was in imminent danger of death or great bodily harm, and, three, the only reasonable means of escape from that danger was by the

has unlawfully and without privilege to do so entered, the residence * * * occupied by the person using the defensive force."  Wright, however, does not argue that he was entitled to a presumption of self-defense under R.C. 2901.05(B)(1).  Even if he had, this presumption specifically does not apply "if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence."  R.C. 2901.05(B)(2).  Given that Dodson had a right to be in the cell he shared with Wright, the presumption afforded by R.C. 2901.05(B) is inapplicable.

12.

use of deadly force, even though he was mistaken as to the existence of that danger.

Wright claims that the inclusion of this instruction and the exclusion of the castle doctrine constituted plain error requiring reversal.

{¶ 31} A trial court has broad discretion in fashioning jury instructions, but it must "'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. A jury instruction must present a correct statement of the pertinent law that is appropriate to the facts. *White* at ¶ 46. "To be entitled to a jury instruction on an affirmative defense such as self-defense, a defendant must introduce sufficient evidence that, if believed, would raise a question in the minds of reasonable jurors as to the existence of such an issue." (Citations omitted.) *State v. Parnell*, 10th Dist. Franklin No. 11AP-257, 2011-Ohio-6564, ¶ 12.

{¶ 32} Wright argues that under *Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, it was incumbent on the trial court to instruct the jury that he had no duty to retreat from his jail cell. In *Cassano,* Cassano stabbed Hardy, his cellmate, 75 times with a shank. Cassano claimed that Hardy had a knife, Cassano snatched it out of his hand to dispose of it, and Hardy responded by grabbing him, hitting him in the face, and kneeing him in the groin. He said that Hardy retrieved the knife and said "this is for you," so

13.

Cassano reclaimed it and stabbed him. *Id.* at ¶ 24. He claimed that despite having been stabbed, Hardy kept coming at him and he eventually "lost it." *Id.* He maintained this defense despite testimony from the prison guards indicating that Cassano continued to stab Hardy even after the guard unlocked the cell to intervene, and that Cassano had a glove on his right hand and the knife was tied to his wrist.

{¶ 33} The trial court in *Cassano* provided an instruction as to the duty to retreat that was similar to the one provided by the trial court here. The Supreme Court of Ohio found that this was error, and that the trial court should not have instructed the jury that Cassano had a duty to retreat because "there is no duty to retreat from one's home." *Id.* at ¶ 73. Significant to the court's decision was the fact that "retreat from his locked prison cell, which was seven and a half feet by ten feet, was never an option for Cassano." *Id.* at ¶ 74. It held that "the trial court should not have instructed on a duty to retreat because retreat was impossible under the circumstances." *Id.* Nevertheless, the court concluded that Cassano suffered no material prejudice as a result of the incorrect instructions. It reasoned:

> Even under Cassano's version of events, Hardy never threatened him with the shank, but simply showed it to him. Cassano became the aggressor by taking the shank away. Then, according to Cassano, Hardy hit him and kneed him. We conclude that Cassano was at fault in creating the situation leading to the affray.

The facts also show that Cassano had no basis for a "bona fide belief that he was in imminent danger of death or great bodily harm" and could "escape from such danger" only by using deadly force. * * * Even under Cassano's version, when he stabbed Hardy, Hardy had no weapon. Once Cassano retrieved the shank and held it in his hand, he was not in danger. Cassano could have shoved the shank under the cell door out into the hallway, as he later did in response to orders from the corrections officers, or simply maintained control of the shank.

Third, Cassano repeatedly stabbed Hardy after Hardy had ceased to pose any conceivable threat to Cassano. Cassano continued the attack even after the correctional officers were at the cell door and ordered him to stop. * * * No reasonable juror could have believed that Cassano acted in self-defense. *Id.* at ¶ 75-77.

{¶ 34} *Cassano* and the present case are factually similar in that there came a point where Wright could no longer claim "a bona fide belief of imminent danger of death or great bodily harm," and Wright continued to attack Dodson even after Dodson "ceased to pose any conceivable threat." *Id.* at ¶ 76-77. This is demonstrated by the fact that Wright was on top of Dodson and continued to pummel him even though Dodson was lying motionless on his back. Wright, on the other hand, escaped with only a scratch between his fingers. As in *Cassano*, we find that no reasonable juror could have found that Wright acted in self-defense.

15.

**{¶ 35}** We also find that the case at bar presents two significant factual differences that make it even clearer that the failure to properly instruct on the duty to retreat did not constitute plain error requiring reversal. First, Wright was not trapped in a locked cell with Dodson. The cell was unlocked. Thus, unlike *Cassano,* retreat was an option for Wright. Second, the undisputed trial testimony established—and the video surveillance clearly shows—that Officer Cairl walked into the cell to intervene. Dodson was on the floor on his back at that point. Instead of allowing Officer Cairl into the cell to defuse the situation, he told her that he was "not done" with Dodson. He forcibly pushed Officer Cairl out of the cell into the hallway and slammed the door shut, knowing it would lock and become jammed because of the battery. He got back on top of Dodson's chest to continue the assault.

**{¶ 36}** "The Castle Doctrine does not provide a license for one to torture another human being." *State v. Kelly*, 8th Dist. Cuyahoga No. 102413, 2015-Ohio-5272, ¶ 25. The rationale for the doctrine is explained by the Supreme Court of Ohio in *Thomas,* 77 Ohio St.3d at 326, 673 N.E.2d 1339:

> [The] exception to the duty to retreat derives from the doctrine that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack. * * * The rationale is that a person in [his or] her own home has already retreated "to the wall," as there is no place to which [he or] she can further flee in safety.

{¶ 37} This rationale has no application under the facts of this case where the defendant has overpowered his alleged assailant; help has not only arrived, but is less than an arm's length away; and the defendant, instead of relenting, has locked himself in the room with the individual who he purportedly feared would cause him great bodily harm.

{¶ 38} Had Wright relented when Officer Cairl entered the cell, the trial court's failure to properly instruct the jury that Wright had no duty to retreat may have constituted plain error. But here, there was an indisputable break in the action, after which Wright deliberately rejected assistance and locked himself in the cell with Dodson. As such, we cannot say that the outcome of the trial clearly would have been different had the jury been properly instructed that there was no duty to retreat.

{¶ 39} We therefore find Wright's first assignment of error not well-taken.

### B. Ineffective Assistance of Counsel

{¶ 40} In his second assignment of error, Wright claims that his trial counsel—who argued during the charge conference that, under *Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, the court "should not instruct that [Wright] had a duty to retreat"—was nonetheless ineffective because he failed to object to the instruction as given. He claims that even if we find no plain error in the failure to correctly instruct the jury, we can still reverse on the basis that counsel was ineffective for failing to object when the appropriate jury instruction was not provided. This, he explains, is because the standard for finding plain error requires a finding that the outcome of the trial would

17.

*clearly* have been different absent the error, whereas the standard for finding ineffective assistance of counsel requires only that there be a *reasonable probability* that, but for counsel's errors, the outcome would have been different. He cites *State v. Dale,* 2d Dist. Champaign No. 2012 CA 20, 2013-Ohio-2229, in support of his position.

{¶ 41} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 42} *Dale* is similar to the present case in that the court found no plain error in the trial court's failure to properly instruct the jury as to the duty to retreat. But *Dale* held that reversal was required because of counsel's failure to request appropriate instructions and to object to the incorrect instruction. The court explained its rationale:

18.

Because we do not know the basis for the jury's verdict, we conclude that there was a reasonable probability that, but for the incomplete jury instruction, the outcome of the case would have been different, i.e., the jury might reasonably have found that Dale acted in self-defense.

{¶ 43} Unlike the court in *Dale,* we find not only is it not *clear* that the outcome of the trial would have been different had the court properly instructed the jury—it is also not *reasonably probable* that a different result would have occurred. We reach this conclusion based on the undisputed evidence showing that Wright continued to choke, punch, and smash Dodson's head against the floor even as Dodson lay motionless on the ground and ceased to pose any threat; Wright twice walked away from Dodson, but then returned to continue the beating; Wright yelled that he was "not done" with Dodson and intentionally shoved Officer Cairl out of the cell, preventing her from intervening; and Wright purposely locked himself in the cell with Dodson. Under these facts, no reasonable juror could have found that Wright established all the elements of self-defense. We therefore find that counsel was not ineffective for failing to object to the jury instruction as given by the court. *See, e.g., State v. Sparks*, 6th Dist. Lucas No. L-87-326, 1988 Ohio App. LEXIS 3376, 10 (Aug. 19, 1988) (finding that even assuming that special instruction on duty to retreat should have been raised by counsel, appellant made no showing of reasonable probability that trial result would have been different).

{¶ 44} We find Wright's second assignment of error not well-taken.

19.

## C. Manifest Weight of the Evidence

{¶ 45} In his third assignment of error, Wright argues that his conviction was against the manifest weight of the evidence. He claims that the evidence corroborated his version of events—i.e., that Dodson attacked him—thus rendering Wright's assault of Dodson reasonable and necessary under the circumstances.

{¶ 46} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 47} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and

20.

discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 48} As we have already discussed in much detail, the overwhelming, undisputed evidence demonstrated that Wright's assault of Dodson was *not* reasonable and necessary under the circumstances. Dodson was lying motionless on the ground, Wright told Officer Cairl that he was not done with Dodson, Wright stepped away from the assault at least twice, only to resume beating Dodson, Wright prevented intervention by Officer Cairl, and Wright deliberately locked himself in the cell with Dodson. No reasonable juror could have found that Wright assaulted Dodson in self-defense. As such, the jury did not clearly lose its way and it did not create such a manifest miscarriage of justice that Wright's conviction must be reversed.

{¶ 49} We find Wright's third assignment of error not well-taken.

### III. Conclusion

{¶ 50} We find Wright's three assignments of error not well-taken. Under the facts of this case, we cannot say that the outcome of the trial clearly would have been different had the judge instructed the jury on the castle doctrine; there was no reasonable probability that the outcome of the trial would have been different if trial counsel had objected to the instruction as given; and the jury's verdict was not against the manifest

21.

weight of the evidence. We therefore affirm the March 11, 2016 judgment of the Lucas County Court of Common Pleas. Wright is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.             _____
JUDGE

Thomas J. Osowik, J.       

_____

Christine E. Mayle, J.          JUDGE
CONCUR.

_____
JUDGE