**[Cite as *State v. Nixon*, 2025-Ohio-2980.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

QUINTON NIXON

    Appellant

C.A. Nos.    31307
              31308

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.   CR 2022 06 2276
             CR 2022 09 3103

DECISION AND JOURNAL ENTRY

Dated: August 20, 2025

---

STEVENSON, Presiding Judge.

{¶1} This is a consolidated appeal. Defendant-Appellant Quinton Nixon appeals the judgments of the Summit County Court of Common Pleas that found him guilty of improperly handling firearms in a motor vehicle, murder, felonious assault, and tampering with evidence. Mr. Nixon does not challenge his convictions for improperly handling firearms and tampering with evidence. This Court affirms.

I.

{¶2} In Case No. 2022-06-2276, Mr. Nixon was charged with one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), a felony of the fourth degree, that also included a specification for forfeiture of the weapon. That charge stemmed from an incident that occurred on June 5, 2022.

{¶3} In Case No. 2022-09-3102, Mr. Nixon was charged with one count of murder in violation of R.C. 2903.02(A) with a three-year firearm specification; one count of murder in violation of R.C. 2903.02(B) (felony murder) with a three-year firearm specification; one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, with a three-year firearm specification; one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree; and tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. Those charges stemmed from an incident that occurred on July 25, 2022.

{¶4} Mr. Nixon pleaded not guilty and the matter proceeded to a bench trial. Prior to trial, the State dismissed the charge for having weapons while under disability. Regarding the matter on appeal, the State presented testimony from five eyewitnesses, four officers and two detectives from the Akron Police Department ("APD"), the Summit County Medical Examiner, and one member of the Special Weapons and Tactics Team ("SWAT"). During his case in chief, Mr. Nixon testified in his own defense. Mr. Nixon also recalled one of the State's eyewitnesses and presented testimony from another APD detective. Numerous exhibits were admitted into evidence, including photos, police body camera footage, surveillance footage, police interviews with the witnesses and Mr. Nixon, the autopsy report, phone call records, email and text messages, BCI reports, and drawings of the scene.

{¶5} The testimony and evidence revealed the following. On July 25, 2022, seven people were present at an apartment located in Akron, Ohio: Angel M., who leased the apartment and resided there; Ron C., a friend of Angel's who was also residing there; Ron's friend, Ashley B., who had been there a couple days; Adam W., a friend of Angel's who had been visiting for a few weeks; Mr. Nixon, who had been there a few days; Brian F. who was visiting that day; and

Brian's girlfriend T.W., the victim in this case, who came with Brian. They were all socializing and using methamphetamine ("meth"). Brian was the only one present that knew T.W. Adam and Brian were close friends. Initially, there were no arguments or threats being made.

{¶6} Angel, Ron, and Ashley testified to essentially the same sequence of events. When Ron and Angel returned to the apartment from a short trip to the store, T.W. was on the couch, and Adam, Mr. Nixon, and Brian were in the kitchen. Ashley was in Ron's bedroom at the end of the hallway. Angel and Ron went into Angel's bedroom to hang lights. Approximately half an hour later, Ashley, Ron, and Angel all heard a commotion and when they came out of their rooms, saw that Mr. Nixon was holding T.W.'s hair or some part of her upper torso in one hand and was pointing a gun at T.W.'s head with his other hand. Mr. Nixon had T.W. pinned against the wall and they were tussling. Angel, Ron, and Ashley returned to their rooms and heard gunshots. The first bullet came through Angel's bedroom wall past her face, ricocheted off the TV, and ended up in the bedroom wall. Ron was grazed in the chin. More gunshots went off and they could hear glass breaking and items being knocked around in the living room. When they opened their bedroom doors again, they saw Brian and Mr. Nixon fighting. Ashley ran into Angel's room with Ron and Angel. Brian, Adam, and Ashley then ran into Ron's room, jumped off the balcony in succession, and fled the scene. Mr. Nixon ran down the hallway with T.W.'s purse and jumped off the balcony after Ashley, Brian, and Adam had already left. As Brian was leaving, he told Angel to call the police and report that Mr. Nixon had killed T.W. Neither Ashley, Ron, nor Angel had heard anyone threaten Mr. Nixon that day.

{¶7} According to Angel, Mr. Nixon had been talking like he thought people were out to get him and everyone tried to get him to go home and get some sleep. Ron overheard Angel tell Mr. Nixon to leave, but Mr. Nixon refused to do so. Prior to hearing the commotion, Ashley

overheard Brian talking about a spy app called "[w]histle, or whisper" that she was familiar with, so she went into the living room and joined that conversation. After hearing the commotion and gunshots from Ron's bedroom, but prior to seeing Brian and Mr. Nixon fighting, she heard Mr. Nixon yelling that T.W. was the police.

{¶8} Brian and Adam's testimony was also similar and is summarized as follows. Brian went to Angel's apartment with T.W. to visit with Adam, who had recently moved back to Akron from Alabama and was staying with Angel, a family friend. Adam always carried a 9mm Smith & Wesson gun, but on the day in question, he never had it out and never threatened anyone with it. Adam introduced Brian to Mr. Nixon. Brian and T.W. were sitting on the couch in the living room and everyone was laughing and joking. T.W. was scrolling on her phone. Adam, Brian, and Mr. Nixon were talking about the whisper app but Adam was not interested and went to the kitchen.

{¶9} While sitting on the couch, Brian began to look at his phone and T.W. was going through her purse looking for something. T.W. laid her gun on the table while she continued looking through her purse. T.W. did not wave the gun around, point it at anyone, or threaten anyone. Brian then heard T.W. gasp and saw that Mr. Nixon had grabbed T.W.'s gun from the table. Mr. Nixon and T.W. began tussling for the gun. Mr. Nixon kept asking if T.W. was the police. Brian started yelling at Mr. Nixon to calm down, saying "[y]ou're tripping[,] [p]ut the gun down[,] [r]elax." Brian described Mr. Nixon as "out of it" and "in another world[.]" Mr. Nixon grabbed T.W. and dragged her over the table. T.W. was trying to get away from Mr. Nixon. Mr. Nixon then started firing shots. Brian attempted to push Mr. Nixon out of the way and bit him on the face but could not wrestle the gun away from him.

{¶10} Adam testified that after he went to the kitchen, he heard Brian yelling, then heard gunshots. He went around the corner while holding his gun and saw Mr. Nixon holding a gun and

standing by T.W. who was motionless. Adam pointed his gun at Mr. Nixon and Brian attacked Mr. Nixon. Adam began to leave from the balcony in Ron's bedroom but heard Brian calling after him. He returned and saw Brian on the floor with Mr. Nixon on top of him. Mr. Nixon had a gun in his hand. Adam hit Mr. Nixon with his own gun but the gun did not fire.

{¶11} Adam went to the living room but could not leave out the front door because T.W.'s legs were in the way. He and Brian then ran out the sliding glass door in Ron's room and jumped off the balcony. They yelled for Angel and Ron to call the police. Brian was afraid because he had a parole violation and Mr. Nixon still had a gun. Both Brian and Adam said they never heard or saw anyone threaten Mr. Nixon prior to the shooting and denied that Brian told Mr. Nixon he would not make it home to see his children that night. Brian never saw Adam with his gun out prior to the fight with Mr. Nixon.

{¶12} Mr. Nixon testified as to his version of the events. He said that when Brian arrived at the apartment, Brian began talking about the whisper app. Mr. Nixon assumed Brian was high on meth and did not think much about it. He said Brian and Adam had guns. When T.W. came in from the driveway, she sat on the couch and Brian introduced him to her. Ron and Angel came back from the store and Brian continued talking to Mr. Nixon and Adam about the whisper app. According to Mr. Nixon, Brian thought Mr. Nixon had the whisper app on his phone and was connected to the police. Mr. Nixon then "hit" T.W.'s weed pen. Adam was sitting on the arm of the couch with his gun beside him on the edge of the couch. T.W. was scrolling on her phone. Ashley came out of her room, sat on the coffee table, and joined the conversation about the whisper app. Mr. Nixon said that he grew fearful because Brian took his phone and had a gun. He implored Angel to tell Brian that he was not the police, but Angel did not comply and instead she got up and walked into her room with Ron.

{¶13} Mr. Nixon decided that he needed to leave and asked for his phone back, but Brian motioned him to sit down and threatened that he "got somebody outside" and "you not gonna make it to see your kids tonight." Brian then pulled a gun out and put it on the table and Adam brandished his gun. Mr. Nixon lunged for the gun that was on the table and started brawling with Brian over the gun while screaming "I'm not the police. I'm not the police[.]" Brian bit Mr. Nixon in the face and put him in a chokehold in an effort to get the gun. Brian called for Adam and Adam pistol-whipped Mr. Nixon three times in the head while Brian was holding him down. All the while, Mr. Nixon was still screaming "I'm not the police" and was "fighting for [his] life." According to Mr. Nixon, "Adam hit me in the head with a pistol and the gun went off."

{¶14} Mr. Nixon then saw a male coming down the hallway with a machete and the male cut Mr. Nixon's face. Mr. Nixon eventually got the gun back from Brian who punched him and went into the kitchen. When Mr. Nixon got the gun, T.W. lunged at him and Mr. Nixon shot three times, hitting T.W. T.W. spun around and he shot again. Adam then ran out the back door in Ron's room and Brian followed. Brian yelled "[h]e shot her. Call the police."

{¶15} In a panic, Mr. Nixon took T.W.'s purse and ran out the back door. Mr. Nixon thought his phone was in T.W.'s purse as well as the vape pen that contained his DNA. He ran away with the gun and dropped it when he no longer felt he was in danger. He said he took the gun because Adam and Brian had left ahead of him and he did not know if they were still armed and would shoot him when he jumped out.

{¶16} Mr. Nixon testified on cross-examination that T.W. did not argue or fight with him nor did she have a weapon. He said Brian had the gun. Mr. Nixon claims that he shot T.W. when she lunged down for the gun while he was being attacked by Brian and Adam. He further stated that Ron had a hammer and a machete and hit him with the machete.

{¶17} Regarding the hammer and machete, Ron testified that he never pulled out a machete or a hammer nor did he ever remove the sword and shield on his bedroom wall to attack anyone. Adam, Angel, and Ashley all testified that they never saw Ron with a machete or a hammer.

{¶18} Mr. Nixon was apprehended on August 24, 2022, at his cousin's house following a standoff with the police and SWAT. During the month that he hid at his cousin's house, Mr. Nixon changed his appearance by shaving his head and facial hair. He was taken into custody by SWAT and transported to the police station for an interview with the Akron police. Midway through the interview, Mr. Nixon changed his story. At first, Mr. Nixon denied ever having T.W.'s gun, denied firing a gun, and said Brian fired the gun. He also said he did not leave the apartment with a purse or a gun. However, when he learned that the detectives had already interviewed the other witnesses and watched the surveillance videos, he admitted he had a gun when he left the scene, but said he dropped it as he was running away. He eventually confessed to shooting T.W., claiming that he was in fear for his life and was in "fight or flight" mode.

{¶19} The court found Mr. Nixon guilty on all the charges and attendant specifications and sentenced him to a term of 21 years to life in prison. Mr. Nixon timely appealed and asserts one assignment of error for our review.

## II.

### ASSIGNMENT OF ERROR NUMBER ONE

**DID THE STATE FAIL TO PROVE BEYOND A REASONABLE DOUBT THAT [MR.] NIXON'S USE OF DEADLY FORCE WAS NOT IN SELF DEFENSE AND HIS CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]**

{¶20} In reaching its guilty verdict, the trial court found that the State presented credible evidence that Mr. Nixon shot and killed T.W. The court also found that the State proved beyond

a reasonable doubt that Mr. Nixon did not act in self-defense; specifically, that Mr. Nixon was at fault in creating the situation giving rise to the shooting of T.W. and/or that he used unreasonable force against her. The court found that there was "no credible evidence that [T.W.] threatened or even tried to harm [Mr. Nixon]." In reaching its verdict, the court noted that "a majority of [Mr. Nixon's] testimony was completely self-serving, illogical, and completely uncorroborated by the physical evidence admitted during trial."

**{¶21}** Mr. Nixon admits that he shot T.W. three times. He does not dispute the Summit County Medical Examiner's testimony that T.W. died as the result of a gunshot wound to the back of her neck. He argues on appeal that the State failed to prove beyond a reasonable doubt that his use of deadly force was not in self-defense.

**{¶22}** "Self-defense is an affirmative defense in Ohio." *State v. Fleckenstein,* 2023-Ohio-4347, ¶ 23 (9th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 24.

> "Self-defense requires that a defendant: (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of . . . great bodily harm and that his only means of escape . . . was in the use of such force; and (3) did not violate any duty to . . . avoid the danger."

*State v. Zink,* 2023-Ohio-1250, ¶ 9 (9th Dist.), quoting *State v. Warren*, 2020-Ohio-6990, ¶ 12 (9th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "'All three of these elements must be present to establish self-defense.'" *Id*.

**{¶23}** "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Messenger* at ¶ 25. Once a defendant satisfies his burden of production, the burden of persuasion shifts to the State "'to prove beyond a reasonable doubt that the accused did not use force in self-defense.'" *State v. Moore*, 2023-Ohio-2864, ¶ 9 (9th Dist.), quoting *State v. Brooks*, 2022-Ohio-2478, ¶ 6. The State satisfies this burden if it disproves any one of the elements of self-defense

beyond a reasonable doubt. *Fleckenstein* at ¶ 24, citing *State v. Williams*, 2020-Ohio-3269, ¶ 10 (9th Dist.).

{¶24} "Also '[t]he defense of self-defense is not available if the defendant used more force than was reasonably necessary and if the force used was greatly disproportionate to the apparent danger.'" *State v. Greenstreet*, 2023-Ohio-4224, ¶ 23 (9th Dist.), quoting *State v. Wright*, 2017-Ohio-1225, ¶ 28 (6th Dist.), citing *State v. Gray*, 2016-Ohio-5869, ¶ 8 (2d Dist.)*; State v. Johnson*, 2009-Ohio-3500, ¶ 12 (6th Dist.).

{¶25} In *State v. McElroy*, 2023-Ohio-1609 (9th Dist.), this Court addressed the State's burden in disproving the affirmative defense of self-defense. Based on the Ohio Supreme Court's pronouncement in *Messenger*, 2022-Ohio-4562, we agreed with the State that its burden of disproving the defense of self-defense was subject to a manifest weight review on appeal rather than a sufficiency-of-the evidence analysis. *McElroy* at ¶ 11, 14. Accordingly, we apply a manifest weight of the evidence standard of review to the State's burden of disproving self-defense.

{¶26} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.). This Court "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 2016-Ohio-443, ¶ 29 (9th Dist.).

{¶27}  In support of his argument that the State failed to meet its burden, Mr. Nixon argues that he satisfied all three prongs of the self-defense test.  He maintains that he not at fault in creating the situation that gave rise to the affray and that "Brian created the environment that led to the shooting" because Brian "started talking about apps and questioning whether [Mr.] Nixon was the police." Mr. Nixon also argues that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from that danger was the use of a firearm.  In support, he points to the fact that Brian and Adam had guns, whereas he did not, and that Brian told him he was not free to leave.  Mr. Nixon claims that "[he] did the only thing that he could do at the time, which was grab the firearm when Brian put it on the table[] [and] [w]hen T.W. lunged at him he fired in self-defense."  Last, he argues that he did not violate a duty to retreat or avoid the danger because he was lawfully in the apartment where he had been residing for a week or more.  We disagree with Mr. Nixon.

{¶28}  As previously noted, the State needed only to disprove one element of Mr. Nixon's self-defense claim to overcome it.  *Fleckenstein*, 2023-Ohio-4347, at ¶ 24 (9th Dist.).  We turn first to Mr. Nixon's claim that the State failed to prove he had a bona fide belief that he was in imminent danger of death or bodily harm. The testimony of the State's witnesses was unanimous that on the day in question, everyone present was getting along and having a good time. There were no arguments and no one threatened Mr. Nixon.  Everyone testified that T.W. spoke very little and made no threatening statements to anyone nor did she try to harm anyone.  She was quiet and spent essentially the entire visit sitting on the couch scrolling on her phone.  Mr. Nixon's own testimony was that T.W. did not argue or fight with him and that she did not have a gun.  There was evidence through Brian's testimony that at one point T.W. took a gun out of her purse to look for something and laid the gun on the table, but at no time did anyone see her wave it around or

threaten to hurt anyone with it. Further, according to Mr. Nixon's version of the events, when he got the gun back from Brian after they fought., T.W. lunged at him, then he fired three shots, hitting T.W. Therefore, by Mr. Nixon's own admission, at the time he fired the shots, T.W. was unarmed. At that point, T.W. was trying to get away from Mr. Nixon. Thus, as the trial court concluded, there was no evidence other than Mr. Nixon's testimony that at the time he fired the shots he had any reason to believe that T.W. posed a threat of imminent danger or great bodily harm. According to all the other witnesses, T.W. had never threatened Mr. Nixon in any way, nor did she have a weapon when he shot her.

{¶29} Accordingly, based on the State's evidence, Mr. Nixon did not have a valid belief that he was in any danger from T.W. Mr. Nixon is the only witness that testified T.W. took any action towards him, claiming that she lunged at him while he had the gun. The trial court was not required to find Mr. Nixon's claim that T.W. lunged at him more credible than the contradictory evidence. Even assuming without deciding that T.W. lunged at Mr. Nixon, since T.W. did not possess a firearm or any other weapon and Mr. Nixon had a gun, the force Mr. Nixon used against T.W. was "'greatly disproportionate to the apparent danger.'" *Greenstreet*, 2023-Ohio-4224, at ¶ 23 (9th Dist.), quoting *Wright*, 2017-Ohio-1225, at ¶ 28 (6th Dist.). Thus, the trial court's finding that Mr. Nixon did not have a bona fide belief that he was in imminent danger of death or bodily harm is not against the weight of the evidence.

{¶30} Although we could conclude our analysis at this point because the State only needed to disprove one of the elements of self-defense, nonetheless, we will address Mr. Nixon's argument that the State failed to prove he was "not at fault in creating the situation giving rise to the affray[.]" *Zink,* 2023-Ohio-1250, at ¶ 9 (9th Dist.), quoting *Warren*, 2020-Ohio-6990, ¶ 12 (9th Dist.). Once again, we disagree with Mr. Nixon.

{¶31} Adam testified that he heard gunshots when he was in the kitchen. Upon moving around the corner into the living room, he saw Mr. Nixon holding a gun and standing by T.W. who was not moving. Brian testified that he saw Mr. Nixon grab T.W.'s gun from the table as she was looking through her purse, then as T.W. and Mr. Nixon tussled for the gun, Mr. Nixon grabbed T.W., dragged her over the table and started firing shots. The people who were in the hallway bedrooms, Angel, Ron, and Ashley, all testified that after hearing a commotion, they came outside and saw Mr. Nixon holding T.W. up against the wall by some part of her upper body and he had a gun pointed at her. After Angel, Ron, and Ashley retreated to their bedrooms, they heard gunshots. Therefore, the State presented evidence from which the court could have reasonably concluded that Nixon initiated the situation that gave rise to the shooting of T.W.

{¶32} Mr. Nixon argues that Brian initiated the situation with his conversation about the whisper app, his accusations that Mr. Nixon was the police, and his statements that Mr. Nixon would not make it home to see his kids. Ashley's testimony corroborated Mr. Nixon's claim that there was a conversation about the whisper app, but she did not identify who started it. She also corroborated Mr. Nixon's testimony that Brian believed Mr. Nixon was the police. Mr. Nixon is the only one who testified that Brian threatened him that he would not see his kids. It was within the court's province to disbelieve Mr. Nixon's evidence and to find the State's evidence credible. The record does not support Mr. Nixon's argument that the trial court lost its way when making this determination. Furthermore, Mr. Nixon did not shoot Brian, so whether Brian initiated the "situation" between him and Mr. Nixon has nothing to do with Mr. Nixon's self-defense claim against T.W.

{¶33} In addition to the foregoing, Mr. Nixon's self-defense claims are undermined by his own actions after the shooting. Mr. Nixon fled the scene with T.W.'s purse, gun, and vape pen

because he thought they contained identifying evidence. Mr. Nixon got rid of the gun while on the run, changed his appearance, and secreted himself at the residence of his cousin for a month until he was forced out of the residence by the SWAT team. Those actions show a consciousness of guilt that contradict his self-defense claim. *See State v. Taylor*, 78 Ohio St.3d 15, 27 (1997), quoting *State v. Eaton*, 19 Ohio St.2d 145 (1969), paragraph six of the syllabus. ("'Flight from justice. . . may be indicative of a consciousness of guilt.'"); *see also State v. Rose*, 2022-Ohio-3197, ¶ 74 (11th Dist.) (stating that the defendant's flight, discarding weapons, and dishonest statements "severely undermine his claim of self-defense.").

{¶34} Also, Mr. Nixon testified that he took the gun with him when he fled because Brian and Adam had already left and possessed guns, so he was afraid they would shoot him. However, the surveillance video shows that Mr. Nixon walked leisurely away from the scene rather than in a state of panic and fear as he claimed. Moreover, as the court noted, there was absolutely no evidence that he was injured by a machete or a hammer as he also alleged. Additionally, there was no evidence apart from his own testimony that Mr. Nixon was prevented from leaving the apartment. In fact, the evidence showed that Angel and others told him to go home and get some sleep, but he declined to do so. Lastly, during his interview at the police station following his arrest, Mr. Nixon changed his story midstream when he learned that the police had already spoken with witnesses and viewed the surveillance video.

{¶35} Based on the foregoing, we conclude that the State did not fail to carry its burden on Nixon's self-defense claim. The State presented competent, credible evidence that Mr. Nixon created the situation leading to the shooting and lacked a bona fide belief that he was in imminent danger of great bodily harm. The court heard testimony from numerous witnesses presented by both the State and Mr. Nixon, listened to the 911 call, watched the video footage, viewed the

photographs, and reviewed the documents introduced into evidence. The court chose not to find Mr. Nixon credible because his version of the events was vastly inconsistent with the other testimony and evidence. The court, as the trier of fact, was in the best position to evaluate the credibility of the testimony and evidence and was free to believe the State's theory of the events and reject Mr. Nixon's version. *See State v. Shank*, 2013-Ohio-5368, ¶ 29 (9th Dist.). We cannot find that this is the exceptional case where the evidence weighs heavily against the conviction. Accordingly, the court's determination that Mr. Nixon did not act in self-defense is not against the manifest weight of the evidence. Mr. Nixon's single assignment of error is overruled.

III.

**{¶36}** Based on the foregoing, Mr. Nixon's assignment of error is overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

HENSAL, J.
CONCURS IN JUDGMENT ONLY.

SUTTON, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

NATHAN A. RAY, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.