[Cite as *State v. Kean*, 2019-Ohio-1171.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 17AP-427 |
| | | (C.P.C. No. 16CR-12) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Nicholas D. Kean, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 29, 2019

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee. **Argued**: *Valerie Swanson*.

**On brief**: *Yavitch & Palmer, Co., L.P.A.*, and *Jeffery A. Linn, II*, for appellant. **Argued**: *Jeffery A. Linn, II*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Nicholas D. Kean, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of murder.

{¶ 2} On January 5, 2016, appellant was indicted on two counts of murder in violation of R.C. 2903.02(A) (purposely causing the death of another) and R.C. 2903.02(B) (felony murder), respectively. The indictment arose out of the stabbing death of John Barnett. The matter came for trial before a jury beginning May 1, 2017.

{¶ 3} The first witness for the state was Hunter Peterson, a close friend of Barnett. On December 23, 2015, at approximately 2:00 p.m., Barnett phoned Peterson to ask if he

wanted to "hang out." (Tr. Vol. II at 182.) Barnett drove to Peterson's residence to pick him up. (Tr. Vol. II at 182.) Peterson lived in the "Hilltop" area of Columbus. (Tr. Vol. II at 182.) Barnett arrived with another individual named "Jose." (Tr. Vol. II at 183.) Peterson entered the backseat of the car; the occupants were smoking marijuana.

{¶ 4} Peterson was aware that Barnett and appellant recently "had some conflict with each other." (Tr. Vol. II at 185-86.) Peterson had observed "a status on Facebook," indicating that "they were arguing." (Tr. Vol. II at 187.) Peterson testified that appellant was "staying with [Barnett] once and * * * that [appellant] stole some money from his dresser * * * and they just were arguing about that or something." (Tr. Vol. II at 187.)

{¶ 5} While driving, Barnett received a call from one of his parents "saying that [appellant] was over at his house and that * * * he drove in the yard or something like that. And he was kind of harassing, * * * just showed up to his house for no reason." (Tr. Vol. II at 188.) Barnett hung up and started "driving towards his house." (Tr. Vol. II at 189.) Barnett was traveling "on Briggs [Road] towards Demorest" Road when they observed appellant driving in the opposite direction. Barnett "yells out the window, 'Pull over.' " (Tr. Vol. II at 189.)

{¶ 6} Barnett turned his vehicle around and drove "toward Binns" Boulevard. (Tr. Vol. II at 189.) Appellant's vehicle, a silver four-door Jeep, was "pulled over [and] parked on a side road." (Tr. Vol. II at 189-90.) Barnett pulled up and parked his vehicle.

{¶ 7} Barnett and appellant both exited their vehicles. Appellant and Barnett then "started throwing punches at each other." (Tr. Vol. II at 197.) Peterson further testified: "And they are in the middle of the street and [appellant] swings towards him." (Tr. Vol. II at 198.) Peterson observed appellant "lunge with his right arm." (Tr. Vol. II at 198.) Peterson then heard Barnett "say, 'He just stabbed me.' " (Tr. Vol. II at 198.) Peterson stated that Barnett was stabbed within 20 seconds of exiting the vehicle. Appellant then "turns around and just gets in his car." (Tr. Vol. II at 199-200.) Appellant "left in a hurry, just drove off quickly." (Tr. Vol. II at 200.)

{¶ 8} Peterson exited Barnett's vehicle and called 911. Barnett was on the ground "gasping for breath like he is having a hard time breathing." (Tr. Vol. II at 200.) Barnett was "not saying anything at all. He is just laying there." (Tr. Vol. II at 200.) While

Peterson was talking to the dispatcher, Jose "says, 'I gotta go.' " (Tr. Vol. II at 202.) Jose drove off in Barnett's vehicle.

{¶ 9} Peterson testified that appellant was not threatened with serious physical harm at the time of the incident. According to Peterson, appellant "got out of his car voluntarily." (Tr. Vol. II at 232.) Peterson did not observe Barnett with any type of weapon. Police detectives subsequently prepared a photo array, and Peterson identified appellant from the array as the individual who stabbed Barnett.

{¶ 10} Jose Martinez, age 25, testified that he and Barnett were good friends. On December 23, 2015, Barnett called Martinez and inquired about getting together. At approximately 11:00 a.m., Barnett drove to the residence of Martinez and they began smoking marijuana. Martinez overheard Barnett arguing on the phone with someone; Martinez heard Barnett "get threatened and him going back and forth with the guy, saying it's no problem to meet up." (Tr. Vol. II at 239.) Martinez told his fiancée they were going to pick up Peterson "and just ride around and smoke." (Tr. Vol. II at 240.)

{¶ 11} Martinez and Barnett left in Barnett's two-door Honda. They picked up Peterson and, as they were driving, Barnett "gets a random phone call and text messages, just threatening phone calls and messages." (Tr. Vol. II at 242.) Martinez heard "something about: I am at your house, I almost had to beat up your neighbor, something, just him going back and forth. [Barnett's] like, 'Leave my dad alone. My dad is older.' " (Tr. Vol. II at 242.) Barnett hung up the phone and "sped up." (Tr. Vol. II at 243.)

{¶ 12} They subsequently observed appellant's vehicle heading in their direction on Binns Boulevard. Appellant "stopped for a second" and "looked at us" and then "took off." (Tr. Vol. II at 244.) Barnett pulled into the parking lot of the "Briggs Stop Mart." (Tr. Vol. II at 246.) Barnett exited the car and looked around. He returned to the vehicle and they traveled "down Briggs Road." (Tr. Vol. II at 246.) They then observed appellant's vehicle heading toward them.

{¶ 13} Martinez testified that "[b]oth vehicles stopped and [Barnett] got out of the vehicle." (Tr. Vol. II at 248.) An individual named "Coty" was with appellant at the time. (Tr. Vol. II at 252.) Appellant and Barnett "met up in the middle of the road and got to fighting. They were both throwing fists at each other." (Tr. Vol. II at 248.) Martinez testified that he observed appellant "duck down, go in his pocket with his right hand."

(Tr. Vol. II at 250.)  Martinez stated that appellant "[r]eached into his hoodie pocket" and "[c]ame out with the knife, stabbed [Barnett].  As he pulled it back, the knife flew onto the floor and then went back a few feet."  (Tr. Vol. II at 251.)

{¶ 14}  The stabbing occurred about ten to fifteen seconds "into the fight."  (Tr. Vol. II at 251.)  Appellant and Coty then "jumped into [appellant's] vehicle, took off."  (Tr. Vol. II at 252.)  Martinez testified that either appellant or Coty picked up the knife before leaving the scene.  Barnett did not have any type of weapon, and, according to Martinez, appellant was not in danger of serious physical harm during the incident.

{¶ 15}  Barnett "pulled up his shirt and he told me * * * 'He stabbed me bro,' and that is when I started seeing blood shooting out of his chest."  (Tr. Vol. II at 252.)  Martinez went to assist Barnett, but Barnett told Martinez to take his vehicle because "he didn't want no damage to happen to it."  (Tr. Vol. II at 255.)  Martinez told Peterson to apply pressure to Barnett's wound.  Martinez then left the scene in Barnett's vehicle; Martinez drove to his residence and parked the vehicle.  He subsequently drove Barnett's vehicle to the hospital and met the police there.  Police later showed Martinez a photo array and he selected appellant's photograph.

{¶ 16} On December 23, 2015, Chelsey Pitts, Martinez's fiancée, was at her residence; Martinez and Barnett were in the kitchen, and Barnett was talking on the phone.  At approximately 2:00 p.m., Martinez and Barnett left the residence in Barnett's vehicle, a black Honda.  Later that afternoon, Martinez returned to the residence "real frantic, panicked."  (Tr. Vol. II at 279.)  Martinez "just kept saying, '[Barnett] asked me to take the car.  [Barnett] asked me to take the car.' "  (Tr. Vol. II at 280.)  Martinez and Pitts subsequently received a call telling them to bring Barnett's car to the hospital.  When they arrived, Martinez spoke to the police for approximately two hours.

{¶ 17} On December 23, 2015, at approximately 3:30 p.m., Columbus Police Officer Patrick McHenry was on patrol when he received a dispatch reporting a stabbing. When the officer arrived at the scene, he observed "a younger man laying on the ground, obviously injured, and another gentleman was leaning over him applying pressure to a chest wound that the gentleman had suffered."  (Tr. Vol. II at 285.)  The man on the ground "had a visible puncture wound in his chest which was sort of a flat wound like a knife would make.  He was semi-conscious but not really responsive."  (Tr. Vol. II at 287.)

{¶ 18} Officer McHenry spoke to witnesses, including Peterson, who gave the officer a description of the assailant "as a 20-ish year old light-skinned male black and/or mixed race." (Tr. Vol. II at 288.) Peterson "said he knew him, he was familiar with him, [and] his name was Nick Kean." (Tr. Vol. II at 288.) Witnesses stated that the assailant "fled the scene in a black or gray Jeep." (Tr. Vol. II at 288.)

{¶ 19} On December 27, 2015, Officer McHenry was on patrol when he observed a Jeep Cherokee parked in front of a residence on Warren Avenue. The vehicle had two different license plates. The officer ran a LEADS check and discovered the registration "came back to Nicholas Kean." (Tr. Vol. II at 295.) The vehicle "looked * * * like it had just been cleaned." (Tr. Vol. II at 340.) Two individuals "came out of the residence that it was parked in front of and told me that someone had sold the car to them for * * * like $200 or some unbelievable low amount of money." (Tr. Vol. II at 340-41.) The vehicle had been sold after December 23, 2015. Officer McHenry contacted appellant's grandmother regarding the vehicle. Appellant's grandmother and mother drove to the scene and claimed ownership of the vehicle.

{¶ 20} On December 23, 2015, Columbus Police Detective Martin Kestner investigated a reported stabbing, and the detective received the name of a suspect, "Nicholas Kean." (Tr. Vol. II at 323.) Appellant subsequently turned himself in to the police, and Detective Kestner interviewed him at police headquarters. Detectives also collected items belonging to Barnett, who died on December 27, 2015; the items included Barnett's clothing and cell phone. A number of months after the incident, defense counsel turned over a blood stained sweatshirt to the prosecutor, which appellant's grandmother had first provided to defense counsel.

{¶ 21} Detectives performed extraction of data from Barnett's cell phone. Texts sent to the phone on December 23, 2015 included texts from appellant's cell phone number. One of the texts from appellant's phone, sent at 2:45 p.m., stated: "Bring some witchu to cause this switchblade goin thru your kidney." (Tr. Vol. II at 349.) Another text sent from appellant's phone at 2:57 p.m. stated: "On my way to yah momma house." (Tr. Vol. II at 349.) A third text, sent at 3:25 p.m., stated: "Ran thru ur yard an almost hadd beat ur neighbor up smh." (Tr. Vol. II at 350.)

{¶ 22} On December 29, 2015, Dr. Donald Pojman, a deputy coroner and forensic pathologist with the Franklin County Coroner's Office, conducted an autopsy of John Barnett. Dr. Pojman noted a stab wound on the left side of Barnett's chest and another wound on the back of the left forearm. The wound to the chest "struck the left lung and also the heart" and was the cause of death. (Tr. Vol. III at 422.) The fatal stab wound traveled a distance of "approximately four to six inches" in striking the heart. (Tr. Vol. III at 430.)

{¶ 23} At the close of the state's case-in-chief, defense counsel made a Crim.R. 29 motion for judgment of acquittal. The trial court denied the motion.

{¶ 24} Karen Kean, the grandmother of appellant, testified on his behalf. Kean identified State's Exhibit H as appellant's "hoodie shirt." (Tr. Vol. III at 457.) Kean stated she found the shirt in a garbage bag appellant had brought to the house following the incident. The shirt had blood on the back. Kean testified she brought the shirt to the office of appellant's attorney and gave the shirt to an individual named Cicero. Kean denied she sold appellant's Jeep Cherokee, and she denied ever seeing the vehicle after the incident.

{¶ 25} On cross-examination, Kean testified she found the sweatshirt in September 2016, approximately ten months after the incident. She stated appellant dropped off the clothing in December 2015, shortly before he turned himself in to authorities but that she waited until September 2016 to go through the items, which were in a trash bag.

{¶ 26} Appellant, age 21, testified on his own behalf. Appellant identified State's Exhibit H as a hoodie he was wearing on the date of the incident. Prior to the incident, appellant resided at his grandmother's residence. Appellant has known Barnett for approximately six years. Appellant considered Barnett a friend, and appellant would occasionally spend the night at Barnett's house. Appellant was at Barnett's residence two weeks prior to the incident; on that occasion, appellant "knocked over one of [Barnett's] bongs" and broke it. (Tr. Vol. III at 481.) Appellant offered to pay him for the bong, and he gave Barnett "$15 or $20." (Tr. Vol. III at 481.)

{¶ 27} On December 23, 2015, appellant was at the house of a friend, Coty Knox; they were planning to smoke marijuana. Appellant has a Facebook page and was "friends" with Barnett. (Tr. Vol. III at 484.) Appellant checked Barnett's Facebook page

that day; Barnett had "said something about not feeling sorry for people and not throwing pity parties and something about not caring about everybody else." (Tr. Vol. III at 484.) Appellant testified he had a problem with the post because "[a]t the time I was going through some things and I felt that he was indirectly stating those things about me. Given that his friends were also my mutual friends, I felt that in a sense he was airing out dirty laundry on the Internet." (Tr. Vol. III at 485.)

{¶ 28} Appellant responded to the post and Barnett subsequently phoned appellant. Appellant stated he felt threatened by the phone call. Appellant testified: "When he called me, he was screaming and hollering like I never heard before and said, 'When I see you, I'm going to break you.' And excuse my language. He said, 'When I see you, I'm going to blow your fucking head off.' " (Tr. Vol. III at 486.) According to appellant, he had previously observed Barnett with a gun.

{¶ 29} Appellant denied that he wanted a physical confrontation with Barnett. Appellant stated: "Personally I don't believe fighting resolves anything." (Tr. Vol. III at 488.) Following the phone call, appellant texted Barnett. Appellant testified: "I had threatened him with a knife." (Tr. Vol. III at 488.) Appellant further stated: "Given that he had just threatened me with a weapon, I thought that if I threatened him back, that maybe he would back off." (Tr. Vol. III at 488.)

{¶ 30} Appellant and Knox left Knox's house. Appellant testified: "We were headed to [Barnett's] house, actually." (Tr. Vol. III at 489.) According to appellant, he went to the home of Barnett's parents to "see[] what was the problem and moving on from there, figuring out the difference." (Tr. Vol. III at 489.) Appellant stated he was feeling "a little bit anxious, nervous about going over there." (Tr. Vol. III at 491.) When they arrived at the home of Barnett's parents, appellant did not see Barnett's vehicle. Appellant texted Barnett "that I had got into a fight with his neighbor and ran through his yard and then I said at the end, shaking my head, 'smh.' " (Tr. Vol. III at 493.)

{¶ 31} Appellant and Knox drove toward a Speedway gas station located on Briggs Road. Appellant stated that his "anxiety was very high." (Tr. Vol. III at 495.) While traveling east, they observed Barnett's vehicle traveling west. Appellant testified Barnett "ended up veering his car into my lane of traffic." (Tr. Vol. III at 496.) Barnett stopped the vehicle; appellant "couldn't hear him, but I could see him mouthing through the

window aggressively, like, 'Get out, pull over.  Get out, pull over.'  He kept saying that." (Tr. Vol. III at 496.)

{¶ 32} Appellant drove around Barnett's vehicle and turned onto Binns Boulevard. He thought Barnett was "going home."  (Tr. Vol. III at 498.)  Appellant pulled into the Binns Elementary School parking lot.  Appellant testified he stopped there to turn around and head back to the store.  He again drove onto Binns Boulevard and, as he approached a stop sign, observed Barnett's vehicle behind him.  Appellant stated he was scared, and when he "looked over to the window, [Barnett] just * * * looked like something like a rabid animal." (Tr. Vol. III at 501.)

{¶ 33} Appellant testified Barnett ran up to his vehicle and "yanked it open."  (Tr. Vol. III at 502.)  Appellant stated he "braced the steering wheel and [Barnett] grabs me by the back of the hoodie and was pulling me out of the vehicle."  (Tr. Vol. III at 502.) Appellant testified: "Once I was out of the car, then I went for the pocket knife that I had." (Tr. Vol. III at 505.)  He described the knife as "[l]ike a switchblade knife, maybe three or four inches long."  (Tr. Vol. III at 505.)

{¶ 34} Appellant testified that, as Barnett grabbed him, the hoodie was "up over my head." (Tr. Vol. III at 506.)  According to appellant, he "couldn't see anything."  (Tr. Vol. III at 506.)  Appellant testified: "As the hoodie is over my head, I just took two aimless swipes at where I thought [Barnett] was."  (Tr. Vol. III at 509.)  Appellant stated that, "[g]iven his actions, I didn't think this was going to be just any regular fist fight." (Tr. Vol. III at 511.)  After the incident, appellant "tossed [the knife] into a trash can."  (Tr. Vol. III at 514.)  Appellant parked the Jeep "in an alley" and had "not seen it since then." (Tr. Vol. III at 514-15.)

{¶ 35} On cross-examination, appellant acknowledged his texts indicated he wanted to engage in a fight with Barnett.  He agreed the text in which he referenced almost having to beat up Barnett's neighbor sounded aggressive.  Appellant did not observe any weapon on Barnett at the time of the confrontation, and Barnett did not say anything to him during the incident.  Appellant acknowledged it was his "choice to pull that knife out and use it."  (Tr. Vol. III at 533.)  Appellant stated that Barnett was maybe able to make one punch "off before I produced the weapon.  I didn't wait for the punch to

pull the weapon."  (Tr. Vol. III at 539.)  Appellant pulled the switchblade out of the pocket of his hoodie.

{¶ 36} Appellant conceded that he told a "slightly different story" when he was interviewed by police on December 24, 2015.  (Tr. Vol. III at 533.)  Appellant informed officers the switchblade was inside the Jeep and that he reached in and pulled the weapon out.  Appellant acknowledged telling the police: "My impression is that we were going to meet up to fight."  (Tr. Vol. III at 536.)  Appellant also told officers the gray hoodie was in the back of the Jeep.

{¶ 37} After stabbing Barnett, appellant "threw" the knife because he was "panicking."  (Tr. Vol. III at 541.)  Appellant then "kind of shook out of it, picked the knife up and left."  (Tr. Vol. III at 542.)  Appellant did not offer assistance to Barnett or call for medical assistance.  Following the incident, appellant parked the Jeep in an alley; he could not recall the particular alley.  Appellant did not know how his Jeep ended up on Warren Avenue.

{¶ 38} Following deliberations, the jury returned verdicts finding appellant guilty of murder as charged in Count 2 of the indictment (felony murder) but not guilty of murder as charged in Count 1.  By judgment entry filed May 31, 2017, the trial court imposed a prison sentence of 15 years to life.

{¶ 39} On appeal, appellant sets forth the following six assignments of error for this court's review:

> ASSIGNMENT OF ERROR NO. 1:
>
> THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY ON THE REBUTTABLE PRESUMPTION OF SELF DEFENSE VIOLATING APPELLANT'S SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION.
>
> ASSIGNMENT OF ERROR NO. 2:
>
> THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY ON LESSER INCLUDED OFFENSES VIOLATING APPELLANT'S SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR NO. 3:

THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, CONTRARY TO HIS RIGHTS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR NO 4:

UNDER THE DOCTRINE OF ACCUMULATED ERROR, THE ERROR COMMITTED BY THE TRIAL COURT AND THE INEFFECTIVE ASSISTANCE OF APPELLANT'S TRIAL COUNSEL WARRANT REVERSAL.

ASSIGNMENT OF ERROR NO. 5:

THE TRIAL COURT ERRED AND THEREBY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

ASSIGNMENT OF ERROR NO. 6:

THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY AND THEREBY DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 40} Under the first assignment of error, appellant contends the trial court erred in failing to give a jury instruction on the rebuttable presumption that he acted in self-defense in stabbing Barnett. Appellant argues various courts have recognized the importance of such an instruction if the evidence presented suggested a defendant was inside his or her residence or vehicle and acting in self-defense.

{¶ 41} In support, appellant cites his own testimony that, while pulling up to a stop sign, Barnett approached his car, opened the door, and pulled him out of the vehicle. According to appellant's testimony, he attempted to hold onto the steering wheel but was removed from the vehicle by his hoodie. Appellant acknowledges the state presented a different set of facts related to the incident (i.e., that appellant and Barnett were both willing participants in the altercation and that they both exited their vehicles and began to fight in the middle of the street). Appellant argues, however, that the trial court supplanted its own opinion of the evidence and improperly limited the jury instructions, thereby prohibiting the jury from deciding one of the key facts of the case, i.e., whether Barnett pulled appellant out of his vehicle.

{¶ 42} Appellant cites to the following comments by the trial court during the parties' discussion of jury instructions:

> And let the record reflect I am purposely not giving the rebuttable presumption instruction * * *. The basis is that I listened to the two witnesses that testified that the defendant was outside of his motor vehicle when the altercation or fight ensued. And the only evidence presented or supporting that instruction is the defendant's self-serving testimony. No other witnesses indicate that he was in his vehicle, and so I will not give that jury instruction.

(Tr. Vol. IV at 607.)

{¶ 43} In general, requested jury instructions should be provided "if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams,* 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. Further, "[a]n appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." *Id.*

{¶ 44} Under Ohio law, self-defense is an affirmative defense, requiring a defendant "to prove three elements by a preponderance of the evidence: '(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *State v. Goff,* 128 Ohio St.3d 169, 2010-Ohio-6317, ¶ 36. Further, "the elements of self-defense are cumulative." *State v. Jackson,* 22 Ohio St.3d 281, 284

(1986).  If a defendant "fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense."  (Emphasis sic.)  *Id.*

{¶ 45}  In general, "[b]ecause of the third element, a defendant claiming self-defense must ordinarily prove that he retreated or avoided the danger if at all possible." *State v. McClendon,* 1st Dist. No. C-050274, 2006-Ohio-1846, ¶ 16.  However, "Ohio has long recognized an exception to the duty-to-retreat requirement of self-defense under what has come to be known as the 'castle doctrine.' "  *State v. Edwards,* 1st Dist. No. C-110773, 2013-Ohio-239, ¶ 6.  Such exception "is founded upon the principle that a person's home is his castle, and thus a person assaulted in his home has no duty to retreat."  *Id.*  In 2008, "the Ohio General Assembly extended the castle doctrine beyond the accused's home to his 'vehicle.' "  *Id.* at ¶ 7.

{¶ 46}  Although the "traditional view of self-defense itself is not codified, several self-defense theories, including the 'castle doctrine,' are found within Chapter 2901 of the Revised Code" (i.e., R.C. 2901.05 and 2901.09).  *State v. Carosiello,* 7th Dist. No. 15 CO 0017, 2017-Ohio-8160, ¶ 17.  R.C. 2901.09(B) (the castle doctrine) states in part that "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, of defense of that person's residence."  R.C. 2901.09(B) "creates an exception to the third element of self-defense, the duty to retreat." *Id.* at ¶ 18.  Further, under the provisions of R.C. 2901.05(B)(1), the legislature "extended this doctrine."  *Id.* at ¶ 19.

{¶ 47}  R.C. 2901.05(B) states in part:

> (1) Subject to division (B)(2) of this section, a person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.
>
> * * *
>
> (3) The presumption set forth in division (B)(1) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence.

{¶ 48} Thus, R.C. 2901.09(B) "creates an exception to the general duty to retreat," and R.C. 2901.05(B)(1) "further explains that a defendant is entitled to a presumption of self-defense if the evidence shows that the victim was 'unlawfully and without privilege to do so' in the defendant's residence." *State v. Lewis,* 8th Dist. No. 97211, 2012-Ohio-3684, ¶ 13. In accordance with R.C. 2901.05(B)(3), "[t]his presumption may be rebutted by the state." *State v. Petrone,* 5th Dist. No. 2011CA00067, 2012-Ohio-911, ¶ 84. In this respect, Ohio appellate courts have held that "the presumption of self-defense may be rebutted by evidence showing the defendant's conduct in the affray did not meet the elements of self-defense." *State v. Nye*, 3d Dist. No. 13-13-05, 2013-Ohio-3783, ¶ 30. The presumption under R.C. 2901.05(B)(3) "is rebuttable by a preponderance of the evidence." *State v. Montgomery,* 12th Dist. No. CA2015-03-028, 2015-Ohio-4652, ¶ 15.

{¶ 49} As noted, appellant argues the trial court erred in failing to provide a rebuttable presumption instruction based on the court's view that it did not find credible appellant's testimony that he was dragged out of his vehicle. In addressing appellant's contention, the state argues any error by the trial court in failing to instruct the jury as to rebuttable presumption was harmless. Specifically, relying in part on the Third District Court of Appeal's decision in *State v. Hadley,* 3d Dist. No. 9-11-30, 2013-Ohio-1942, the state contends that, even under appellant's version of the events, the jury would not have reached a different result if a rebuttable presumption instruction had been provided because no rational juror could have found appellant's decision to use a deadly weapon (i.e., a switchblade knife) during a fist fight reasonably warranted under the circumstances and proportionate to the apparent threat.

{¶ 50} We begin with a consideration of *Hadley* in which the defendant argued, similar to appellant's contention in the instant case, the trial court erred in denying his request to instruct the jury on the rebuttable presumption of self-defense. Under the facts of that case, Donald Ayars, a census taker, came to the defendant's residence and knocked on the door. Ayars testified the defendant became upset and shoved him; as Ayers attempted to exit the front porch, the defendant then grabbed an aluminum bat from inside his front door and struck Ayars. According to the testimony of Ayars, he did not

enter the defendant's residence; by contrast, the defendant testified Ayars stepped across the doorway threshold, at which time defendant struck him.

{¶ 51} The trial court in *Hadley* instructed the jury on the affirmative defenses of self-defense and defense of another. The court, however, denied the defendant's request to instruct the jury on the presumption of self-defense under R.C. 2901.05(B)(1), "concluding that the Castle Doctrine was inapplicable to the facts" of the case. *Id.* at ¶ 15. The jury subsequently returned a verdict finding the defendant guilty of felonious assault with a deadly weapon.

{¶ 52} On appeal, the defendant argued the trial court erred in failing to provide the requested rebuttable presumption instruction. More specifically, appellant argued that, even though the evidence was insufficient to convince the jury of his affirmative defense of self-defense by a preponderance of the evidence, "and even though the jury found the prosecution's evidence was sufficient to establish the elements of felonious assault beyond a reasonable doubt, the jury could have found the prosecution's evidence was not sufficient to rebut the presumption of self-defense under R.C. 2901.05(B)(1) by a preponderance of the evidence." *Id.* at ¶ 38.

{¶ 53} The Third District Court of Appeals rejected appellant's argument. While the reviewing court found the basis for the trial court's denial of the instruction "was misplaced" (based on the fact that any privilege Ayers may have had to be at the residence was revoked when the defendant asked him to leave), the appellate court further considered whether the trial court's ruling "was prejudicial to [the defendant's] case or whether it constituted harmless error." *Id.* at ¶ 43. The court found that, "under the circumstances of this case, even as described by [the defendant's] version of events, no rational jury could have found that [the defendant's] use of a baseball bat against [the victim] was reasonably necessary or proportionate to the apparent danger." *Id.* at ¶ 48.

{¶ 54} The court in *Hadley* further explained:

> The jury determined that the evidence in this case established the elements of felonious assault beyond a reasonable doubt notwithstanding Hadley's version of events. As such, a rational jury could not have found that the same evidence which was sufficient to override and completely obviate any further consideration of Hadley's affirmative defense and sufficient to establish the elements of felonious assault by proof beyond a reasonable doubt, was somehow not sufficient

> to rebut a presumption of self-defense under R.C. 2901.05(B) by a mere preponderance of the evidence. This also means that any possible error in the trial court's comments to the jury regarding the duty to retreat * * * would be harmless and could not have affected the outcome in this case or constituted reversible error, because no rational juror could have reasonably gotten that far in their consideration of the elements of self-defense in view of the excessive force used by the defendant.

*Id.* at ¶ 49.

{¶ 55} In its decision, the court in *Hadley* construed the language of R.C. 2901.05(B) as permitting the prosecution "to rebut the presumption of self-defense contained in R.C. 2901.05(B)(1) by demonstrating by a preponderance of the evidence that the actual elements of self-defense were not established by the facts presented in a particular case." *Id.* at ¶ 62. In so holding, the court cited with approval other Ohio appellate districts that "have reviewed whether the *actual elements of self-defense* have been rebutted by the evidence in the record." (Emphasis sic.) *Id.* at ¶ 61, citing *Petrone* at ¶ 73; *State v. Kozlosky,* 195 Ohio App.3d 343, 2011-Ohio-4814, ¶ 26, 29 (8th Dist.).

{¶ 56} It has similarly been observed the decision in *Hadley* "falls in line with decisions from other sister districts" holding that the state may rebut the castle doctrine presumption where "the defendant's actions do not comport with the elements of self-defense." *Carosiello* at ¶ 21. In this respect, Ohio courts have held a trial court's failure to give a castle doctrine instruction is not reversible error if there was evidence by which the jury could have found the presumption of self-defense was rebutted. *See Nye* at ¶ 30-32 (trial court did not err in declining to give instruction on the presumption of self-defense; even assuming the facts implicated such an instruction, the state presented evidence to adequately rebut the presumption, including evidence appellant did not have reasonable grounds to believe he was in imminent danger of death or great bodily harm); *State v. Wright,* 6th Dist. No. L-16-1053, 2017-Ohio-1225, ¶ 34 (trial court's failure to incorporate castle doctrine instruction did not affect outcome of trial where evidence indicated defendant "could no longer claim 'a bona fide belief of imminent danger of death or great bodily harm,' " and "no reasonable juror could have found that [the defendant] acted in self-defense").

{¶ 57} Courts applying the holding *Hadley* have also rejected the argument (similar to that made by appellant in the instant case) that, in cases in which the castle doctrine is applicable, the defendant's "own conduct during the incident is not at issue." *Carosiello* at ¶ 20. In *Carosiello,* the Seventh District Court of Appeals relied on *Hadley* in holding that such "argument is clearly contrary to both a plain reading of the statute as a whole and the established law in Ohio." *Id.* In rejecting that argument, the court in *Carosiello* relied on the following language in *Hadley*:

> [U]nder Hadley's interpretation of the statute, the prosecution is precluded from ever rebutting the actual elements of self-defense with evidence that the defendant was not justified in using force or that the defendant used force unreasonably necessary and disproportionate to the apparent danger presented by the situation.
>
> This would mean that in every scenario in which the presumption of self-defense stated in R.C. 2901.05(B)(1) applies, the defendant is entitled to use any amount of force – even if it is unjustified or disproportionate to the apparent danger presented – against someone in his or her residence who is not privileged to be there regardless of the particular facts and circumstances of the situation. This produces an absolute license to commit any level of violence, including deadly force against any trespasser, immediately upon revoking their privilege to be there, and regardless of the circumstances.

*Carosiello* at ¶ 20, quoting *Hadley* at ¶ 58-59.

{¶ 58} As set forth above, the second element of self-defense requires a defendant show he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. *Goff* at ¶ 36. One component of the second element "entails a showing that the defendant used 'only that force that is reasonably necessary to repel the attack.' " *State v. Bundy,* 4th Dist. No. 11CA818, 2012-Ohio-3934, ¶ 55. *See also Montgomery* at ¶ 16, quoting *State v. Ray*, 12th Dist. No. CA2012-10-213, 2013-Ohio-3671, ¶ 30 ("The second element of self-defense involves determining whether the defendant's use of force was 'reasonably necessary to repel the attack' or in other words, whether the defendant used excessive force."). Implicit in the "second element of self-defense, i.e., that the defendant's use of deadly force was in 'good

faith,' is the requirement that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *State v. Hendrickson,* 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶ 31. Thus, " '[i]f * * * the amount of force used is so disproportionate that it shows an "unreasonable purpose to injure," the defense of self-defense is unavailable.' " *Bundy* at ¶ 55, quoting *State v. Macklin,* 8th Dist. No. 94482, 2011-Ohio-87, ¶ 27, quoting *State v. Speakman,* 4th Dist. No. 00CA035 (Mar. 27, 2001). Under Ohio law, "[t]his rule applies even if a defendant is attacked in his residence or vehicle," as "[a] defendant who is attacked in his or her residence or vehicle does not possess a license to kill." *Id.* at ¶ 56. Rather, "the defendant may only use deadly force if necessary to prevent death or great bodily injury." *Id.,* citing *State v. Thomas,* 77 Ohio St.3d 323, 327 (1997).

{¶ 59} On review of the evidence presented in the instant case, we agree with the state's argument that any error by the trial court in failing to instruct the jury on the rebuttable presumption of self-defense was harmless beyond a reasonable doubt, as no rational jury could have found appellant's use of a knife under the facts and circumstances of this case was reasonably necessary and proportionate to the danger presented. As noted by the state, appellant conceded he did not observe Barnett with a weapon during the incident, and the evidence was undisputed that the stabbing occurred within 15 to 20 seconds of Barnett exiting his vehicle. Appellant admitted that he pulled the knife out within seconds of the altercation; according to appellant's own testimony, one punch was "all [Barnett] was able to get off before I produced the weapon," and appellant "didn't wait for the punch to pull the weapon." (Tr. Vol. III at 539.) Appellant proceeded to stab Barnett twice, with the fatal wound going into his chest with sufficient force to lacerate the left lung and heart. The coroner testified that the fatal stab wound traveled "four to six inches" before hitting Barnett's heart. (Tr. Vol. III at 430.)

{¶ 60} While appellant stated Barnett had earlier threatened him, appellant admitted he was not threatened with a weapon "at that very moment" and that he "couldn't see if [Barnett] had [a weapon] at that very moment." (Tr. Vol. III at 511.) Hunter Peterson and Jose Martinez, both of whom were eyewitnesses to the stabbing, testified Barnett was unarmed and there was no evidence that Barnett threatened to use a weapon during the incident. Further, none of the witnesses heard Barnett threaten

appellant and appellant testified that "the only thing" Barnett said to him during the altercation was: "You stabbed me." (Tr. Vol. III at 540.) Appellant, who acknowledged telling the police that it was his impression they were going to meet up to fight, had earlier texted Barnett to state: "[B]ring sum witchu to cause this switchblade goin thru your kidney." (Tr. Vol. III at 404.)

{¶ 61} The evidence presented simply did not support appellant's assertion he had a reasonable belief he was in imminent danger of death or serious bodily harm at the time of the altercation, nor did the evidence reasonably support a finding appellant's decision to stab (unarmed) Barnett in the chest was a necessary and proportionate response to what was, at most, a single punch thrown during a fist fight. Rather, appellant "used deadly force when he was not faced with deadly force, only fists." *Ray* at ¶ 32 (defendant, while receiving minimal injuries from being punched in the head four or five times, used unreasonable force in stabbing victim in chest with hunting knife and, therefore, could not "show prejudice from the trial court's omission of the 'no duty to retreat from one's own home' instruction"). In sum, the overwhelming evidence in this case indicates that "[t]he degree of force used by appellant was neither warranted under the circumstances nor proportionate to the perceived threat." *State v. Green,* 12th Dist. No. CA2017-11-161, 2018-Ohio-3991, ¶ 36.

{¶ 62} Here, even accepting the facts "implicated the presumption of self-defense" set forth under R.C. 2901.05(B)(1), and "the burden had been shifted to the prosecution" to prove appellant did not act in self-defense, the state presented evidence "to adequately rebut the presumption by a preponderance of the evidence." *Nye* at ¶ 30-32 (presumption of self-defense rebutted by state's evidence showing defendant "did not have reasonable grounds to believe he was in imminent danger of death or great bodily harm and that his only reasonable response was the use of deadly force"). *See also State v. Callahan*, 8th Dist. No. 102900, 2016-Ohio-2934, ¶ 31-33 (even assuming the presumption of self-defense applied and that burden had been shifted to prosecution to prove defendant did not act in self-defense, record shows prosecution presented evidence to adequately rebut presumption by preponderance of evidence where state demonstrated defendant did not have reasonable grounds to believe he was in imminent danger of death or great bodily harm and that his only reasonable response was use of deadly force where

victim was unarmed).  Accordingly, any error by the trial court in failing to provide a rebuttable presumption jury instruction was harmless beyond a reasonable doubt. *Hadley* at ¶ 49; *State v. Whitman,* 5th Dist. No. 2017CA00079, 2018-Ohio-2924, ¶ 64-65 (error by trial court in omitting castle doctrine harmless; had jury been instructed on castle doctrine "it would have no effect on the inescapable conclusion" that appellant did not act in self-defense where evidence showed appellant did not reasonably believe shooting victim was his only choice to avoid bodily harm or death).

{¶ 63} Based on the foregoing, appellant's first assignment of error is not well-taken and is overruled.

{¶ 64} Under the second assignment of error, appellant contends the trial court erred in failing to give lesser-included offense jury instructions.  According to appellant, there was sufficient evidence presented to establish he acted out of a fit of rage or heat of passion so as to require a voluntary manslaughter instruction.  Appellant also argues an involuntary manslaughter instruction was warranted on the basis that the jury could have concluded his conduct in using a knife was reckless, but that he never intended to kill Barnett.  Appellant acknowledges it does not appear trial counsel objected to the trial court's refusal to instruct on any lesser-included offenses.

{¶ 65} In general, a reviewing court utilizes "the abuse of discretion standard to decide whether the trial court erred in determining that there was insufficient evidence presented to reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *State v. Moman,* 4th Dist. No. 16CA1022, 2017-Ohio-453, ¶ 12, citing *State v. Shane,* 63 Ohio St.3d 630, 632 (1992).  In accordance with Crim.R. 30(A), "a party is required to object to a jury instruction after the instruction has been given but before the jury retires in order to raise the issue on appeal." *State v. Stevenson,* 10th Dist. No. 17AP-512, 2018-Ohio-5140, ¶ 20.  The failure to object to jury instructions "waives all but plain error on appeal." *Id.,* citing Crim.R. 52(B); *State v. Long,* 53 Ohio St.2d 91 (1978).  Further, "[a]n error in a jury instruction does not constitute a plain error unless, but for the error, the outcome of the trial clear[ly] would have been otherwise." *Id.,* citing *Long* at paragraph two of the syllabus.

{¶ 66} We first address appellant's contention the trial court erred in failing to instruct on voluntary manslaughter.  R.C. 2903.03(A) defines voluntary manslaughter

and states in part: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another."

{¶ 67} Voluntary manslaughter is "an inferior degree of murder." *State v. Rhodes,* 63 Ohio St.3d 613, 617 (1992). Although "voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought." *Shane* at 632. Accordingly, "a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." *Id.* However, "[a]n instruction is not warranted simply because the defendant offers 'some evidence' going to the lesser included [or inferior degree] offense." *State v. Gray,* 12th Dist. No. CA2010-03-064, 2011-Ohio-666, ¶ 23, citing *Shane* at 632-33. Rather, "[t]here must be 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense.' " (Emphasis sic.) *Id.*, quoting *Shane* at 632.

{¶ 68} The Supreme Court of Ohio has held that "[t]he test for voluntary manslaughter includes both an objective and a subjective component." *State v. Thompson,* 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 153. With respect to the "objective factor—a fact-finder must determine whether a serious provocation occurred and whether that provocation was 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id.,* quoting *Shane* at 635. Regarding "the subjective factor—the fact-finder must evaluate whether 'this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.' " *Id.,* quoting *Shane* at 634. A defendant being tried for murder must prove the mitigating circumstances of R.C. 2903.03(A) "by a preponderance of the evidence." *Id.*, citing *Rhodes* at 620.

{¶ 69} This court has noted that "[s]elf-defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage." *State v. Thompson,* 10th Dist. No. 92AP-1124 (Feb. 23, 1993). Further, "[w]hen analyzing the subjective prong of

the test, '[e]vidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 13.

{¶ 70} In the present case, even assuming the objective prong was satisfied, the evidence presented by appellant fails to satisfy the subjective prong, i.e., the testimony by appellant does not suggest he was acting under a sudden passion or fit of rage to warrant an instruction on voluntary manslaughter. When asked what emotion he was feeling when he observed Barnett get out of his vehicle, appellant responded he was "scared" and "was really worried about what was about to happen." (Tr. Vol. III at 501.) Appellant further testified he "was afraid." (Tr. Vol. III at 507.) According to appellant, he was "concerned for [his] safety and * * * well-being." (Tr. Vol. III at 503.) Appellant described his emotions as "actually like petrified." (Tr. Vol. III at 503.) Thus, in considering the subjective standard, appellant's "own testimony" failed to support and undermined any claim that he acted out of sudden passion or fit of rage. *State v. Collins,* 97 Ohio App.3d 438, 446 (8th Dist.1994) (no evidence defendant subjectively acted under influence of sudden passion or fit of rage where defendant "repeatedly testified he tried to avoid *any* fight with the victim and acted *solely* in self-defense 'because all I was trying to do was protect myself' "). (Emphasis sic.)

{¶ 71} In light of the testimony presented, while the evidence, as found by the trial court, supported an instruction on self-defense, we find no error by the court in failing to instruct on voluntary manslaughter. *See Stevenson* at ¶ 25 (trial court did not err in denying request to instruct on voluntary manslaughter where appellant testified he shot victim because he "feared for his life" and thought victim was going to shoot him); *State v. Caldwell,* 10th Dist. No. 98AP-165 (Dec. 17, 1998) (trial court did not err in failing to instruct on voluntary manslaughter where evidence indicated defendant acted out of fear); *State v. Hamilton,* 4th Dist. No. 09CA3330, 2011-Ohio-2783, ¶ 90 (trial court did not err in failing to instruct on voluntary manslaughter where defendant "repeatedly testified that he was afraid" of victim and started stabbing victim out of fear of being choked to death).

{¶ 72} Appellant also contends the trial court erred in failing to instruct on involuntary manslaughter. In support of this argument, appellant acknowledges he "brought a knife to a fist fight" but argues that his conduct in "removing" the knife to create separation between himself and Barnett was merely "reckless." (Appellant's Brief at 25.)

{¶ 73} R.C. 2903.04 defines involuntary manslaughter in part as follows: "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony," or as a proximate result of the offender committing or attempting to commit "a misdemeanor of any degree." R.C. 2903.04(A) and (B). Under Ohio law, "involuntary manslaughter is a lesser-included offense of murder." *State v. Rice,* 12th Dist. No. CA2003-01-015, 2004-Ohio-697, ¶ 41, citing *State v. Thomas,* 40 Ohio St.3d 213, 215 (1988). If a lesser-included offense is identified, "the court must then examine the facts and decide whether the jury could reasonably conclude that the evidence supports a conviction for the lesser offense and not the greater." *Id.,* citing *State v. Kidder,* 32 Ohio St.3d 279, 280 (1987).

{¶ 74} As noted by the state, appellant does not identify what predicate felony or misdemeanor would have supported an instruction on involuntary manslaughter. This court has previously held that where a defendant "has not identified what predicate offense he believes the involuntary manslaughter instruction should have been based on, we cannot determine whether involuntary manslaughter would be a lesser-included offense of felony murder." *State v. Hubbard,* 10th Dist. No. 11AP-945, 2014-Ohio-122, ¶ 21.

{¶ 75} Further, appellant's claim that his conduct was merely reckless is not supported by the record. In the present case, the evidence indicates that appellant stabbed Barnett twice, with the fatal wound striking four to six inches into Barnett's chest and lacerating his lung and heart. Both Peterson and Martinez provided eyewitness testimony as to appellant pulling out the switchblade knife and stabbing Barnett within 20 seconds of the confrontation. While appellant claimed his hoodie was up over his head, even by his own admission, his intent was to swing the knife (i.e., a deadly weapon) at Barnett; specifically, appellant testified he took two swipes with the switchblade "at where I thought [Barnett] was." (Tr. Vol. III at 509.) Shortly before the stabbing,

appellant had texted Barnett to state: "[B]ring sum witchu to cause this switchblade goin thru your kidney." (Tr. Vol. III at 404.)

{¶ 76} The evidence presented at trial, including the location and depth of the fatal stab wound and appellant's own testimony that he intended to swing the knife at Barnett, undermines his claim of mere reckless behavior, and we find the trial court did not err in failing to instruct on involuntary manslaughter. *See, e.g., State v. Waller*, 2d Dist. No. 2013-CA-26, 2014-Ohio-237, ¶ 2 (trial court did not err in failing to instruct on reckless homicide where, on the evidence presented, no reasonable jury could have found that defendant acted less than knowingly in stabbing his victim in the chest with a knife, penetrating six inches into the victim's chest); *State v. Smith,* 1st Dist. No. C-080712, 2009-Ohio-6932, ¶ 31 (trial court's failure to instruct on involuntary manslaughter not plain error; defendant stabbed victim in heart with knife, and "[n]o jury could have reasonably found that [defendant] had recklessly inflicted these injuries"); *State v. Mulkey*, 98 Ohio App.3d 773 (10th Dist.1994) (trial court's failure to instruct the jury on involuntary manslaughter did not rise to the level of plain error given defendant's admission that he stabbed the victim twice, once in the chest and again in the head).

{¶ 77} Based on the foregoing, appellant's second assignment of error is not well-taken and is overruled.

{¶ 78} Appellant's third and fourth assignments of error are interrelated and will be considered together. Under the third assignment of error, appellant asserts he was denied effective assistance of counsel. Specifically, appellant points to the following ten alleged instances of deficient performance by trial counsel: (1) failing to object to additional evidence on redirect, (2) stipulating to the admissibility of downloaded material from Barnett's phone, (3) questioning Detective Kestner about what appellant told law enforcement, (4) objecting to a witness's response to a question defense counsel had posed to that witness, (5) permitting appellant's grandmother to testify that she gave appellant's hoodie to an attorney named Cicero, who appellant describes as "a well-known disciplined lawyer," (6) attempting to call forensic scientist Colleen Hague, who performed DNA testing, even though defense counsel had previously stipulated to the report and did not subpoena Hague to appear, (7) inquiring of appellant if there was anything counsel had missed, (8) failing to object when the trial court indicated it would

not instruct on lesser-included offenses, (9) requesting the court to refresh counsel's memory as to Evid.R. 404 and 608, and (10) attempting to admit a signed document by Hague regarding the DNA, which the trial court denied. Under the fourth assignment of error, appellant argues that cumulative error by trial counsel and the trial court denied him a fair trial.

{¶ 79} In order to prevail on a claim of ineffective assistance of counsel, a defendant "must satisfy a two-prong test." *State v. Kennard,* 10th Dist. No. 15AP-766, 2016-Ohio-2811, ¶ 14, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Under the first prong, a defendant must "demonstrate that his trial counsel's performance was deficient." *Id.* If a defendant "can show deficient performance, he must next demonstrate that he was prejudiced by the deficient performance." *Id.* A defendant's "failure to make either showing defeats a claim of ineffective assistance of counsel." *Id.,* citing *State v. Bradley,* 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697.

{¶ 80} In order to demonstrate deficient performance by counsel, a defendant "must show that his counsel committed errors which were ' "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." ' " *Id.* at ¶ 15, quoting *State v. Phillips,* 74 Ohio St.3d 72, 101 (1995), quoting *Strickland* at 687. Further, a defendant "must overcome the strong presumption that defense counsel's conduct falls within a wide range of reasonable professional assistance." *Id.,* citing *Strickland* at 689. In order to show prejudice, a defendant "must establish there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the trial would have been different." *Id.,* citing *Strickland* at 689.

{¶ 81} Appellant first asserts his counsel was ineffective for not objecting to the state's request to elicit new information on rebuttal. Specifically, appellant argues the state failed to show a photo array to Martinez during direct examination, but the prosecutor subsequently requested the court allow him to question the witness about the array during redirect examination. The trial court permitted the questioning on redirect.

{¶ 82} Under Ohio law, "[t]he control of redirect examination is committed to the discretion of the trial judge and a reversal upon that ground can be predicated upon nothing less than a clear abuse thereof." *State v. Wilson,* 30 Ohio St.2d 199, 204 (1972). In a similar vein, "[w]hile it is generally held that the redirect examination of a witness

cannot be broader than the cross-examination, nevertheless, the scope of redirect examination lies within the sound discretion of the trial court." *State v. Pitts,* 10th Dist. No. 85AP-309 (Jan. 23, 1986).

{¶ 83} In the instant case, the record reflects no abuse of discretion by the trial court in permitting the witness to testify regarding the photo array and, therefore, appellant has not shown counsel was ineffective in failing to object.  Further, inasmuch as identity was not an issue in the case, appellant cannot demonstrate prejudice.

{¶ 84} Appellant next contends his counsel was ineffective in stipulating to the admissibility of downloaded material from Barnett's cell phone.  At trial, the parties stipulated that State's Exhibit J "is [Barnett's] phone exam from this incident that was done by Detective Howe."  (Tr. Vol. II at 346.)  Appellant notes that text messages from the phone were subsequently admitted into evidence.

{¶ 85} Appellant also notes the state made a motion in limine with respect to defense counsel's desire to use, during cross-examination of a witness, "a series of Facebook conversations that are * * * between other parties, not the defendant, weeks before the offense."  (Tr. Vol. III at 357.)  The prosecutor represented to the trial court that the Facebook conversations "are private messages * * * between other parties having nothing to do with this" and that "the defendant, himself, was not aware of any of these conversations."  (Tr. Vol. III at 357-58.)  The trial court ruled at the time that, in "a self-defense case, it is what is in the mind of the defendant. * * * And if he didn't know about it, then it is completely irrelevant."  (Tr. Vol. III at 359.)

{¶ 86} On appeal, appellant acknowledges the character of the victim is only relevant to the issue of a defendant's state of mind if the defendant knew about it.  Appellant argues, however, the contents of the phone download were apparently "misunderstood" by trial counsel.  (Appellant's Brief at 28.)

{¶ 87} As this court has previously noted, "[i]t is a well-established principle that decisions regarding stipulations are matters of trial strategy and tactics."  *State v. Roy,* 10th Dist. No. 14AP-986, 2015-Ohio-4959, ¶ 22, citing *State v. Rippy*, 10th Dist. No. 08AP-248, 2008-Ohio-6680, ¶ 16.  Here, appellant fails to indicate why the evidence that was the subject of the stipulation, if objected to, would not have been admissible.

Appellant has therefore not shown that counsel was ineffective for entering into the stipulation at issue.

{¶ 88} Appellant next argues ineffective assistance based on trial counsel's cross-examination of Detective Kestner, in which counsel questioned the detective regarding information appellant provided law enforcement officials following the incident. Specifically, trial counsel asked the detective whether the blood on appellant's sweatshirt was "consistent with what he described to you?" (Tr. Vol. III at 365.) The trial court sustained the state's objection on the basis that the inquiry sought the witness to "vouch for the credibility of your client." (Tr. Vol. III at 365.)

{¶ 89} Appellant argues the information his counsel sought from the detective constituted hearsay. As noted by the state, however, the fact that trial counsel was unsuccessful in eliciting inadmissible hearsay testimony does not render counsel's performance deficient, nor has appellant demonstrated prejudice from the alleged deficiency.

{¶ 90} Appellant also cites as ineffective assistance his trial counsel's objection to his own question on cross-examination. Specifically, during the recross-examination of Detective Kestner, defense counsel asked the witness: "How do you know that Nick's grandmother attempted to sell his Jeep?" (Tr. Vol. III at 405.) Detective Kestner responded in part: "The couple * * * that came out to talk to us when we were impounding the Jeep said that a woman had attempted to sell them the Jeep and when - - this was not in my presence." (Tr. Vol. III at 405-06.) Defense counsel then stated: "Objection." (Tr. Vol. III at 406.) Although not entirely clear from the record, counsel apparently raised the objection to his own question based on concern that the detective was about to provide hearsay testimony.

{¶ 91} On appeal, appellant appears to contend trial counsel should not have posed the question at all. In general, however, "[a] trial counsel's line of questioning on cross-examination is a matter of trial strategy." *State v. Ferguson*, 10th Dist. No. 07AP-999, 2008-Ohio-6677, ¶ 64. Thus, a reviewing court "will not question counsel's strategic decision to engage, or not engage, in a particular line of questioning as these decisions are presumed to be the product of sound trial strategy." *State v. Davis,* 12th Dist. No.

CA2012-12-258, 2013-Ohio-3878, ¶ 25. Further, appellant has failed to demonstrate how the exchange at issue prejudiced him or affected the outcome of the trial.

{¶ 92} Appellant's fifth claim of ineffective assistance of counsel involves the testimony of appellant's grandmother, Karen Kean, during which she related the circumstances in which she located appellant's hoodie and took the clothing to the office of defense counsel. More specifically, appellant notes his grandmother mentioned during her testimony that she handed the items over to an individual named Cicero. Appellant argues that "Cicero is a well-known disciplined lawyer." (Appellant's Brief at 29.) Appellant maintains the danger of the name "even being associated with trial counsel or [a]ppellant causes alarm." (Appellant's Brief at 31.) According to appellant, jurors should have been questioned as to whether they knew of Cicero or his reputation.

{¶ 93} In response, the state argues there is no evidence any of the jurors were aware of Cicero's reputation, nor is there any indication from the record that the individual mentioned was the same attorney that faced past disciplinary problems. The state also argues that no party argued about Cicero's reputation during the proceedings.

{¶ 94} The record indicates that, on direct examination, defense counsel asked Kean what she did with appellant's sweatshirt after it was found. Kean responded: "At that point I brought it down to your office. I believe it was Mr. Cicero that accepted the hoodie sweatshirt." (Tr. Vol. III at 458.) Later, during cross-examination, the prosecutor asked Kean: "Who did you turn [the clothing] into?" (Tr. Vol. III at 463.) Before Kean could respond, the trial court called counsel to a sidebar outside the presence of the jury. The trial court inquired of the prosecutor: "Why do we need to bring Cicero into it, his name?" (Tr. Vol. III at 464.) The prosecutor explained the question was directed toward the issue of chain of custody. The trial court then requested the prosecutor frame the question "a different way without asking" about the name of the individual who received the items at the office. (Tr. Vol. III at 465.) The prosecutor agreed to change the inquiry to: "Do you know what happened to it after you turned it in?" (Tr. Vol. III at 465.)

{¶ 95} On review, we agree with the state that there is no indication from the record that any juror was aware of the individual named (or of that individual's purported reputation). Accordingly, there is nothing in the record to show Kean's mention of the

name Cicero, in the context of dropping off clothing at defense counsel's office, resulted in prejudice to appellant.

{¶ 96} Appellant next claims ineffective assistance based on the fact that defense counsel stipulated to a report prepared by a forensic scientist (Colleen Hague) but later attempted to call this individual as a witness.  Appellant argues that, while counsel "had previously stipulated to the report," counsel "did not subpoena Hague to appear." (Appellant's Brief at 33.)  In response, the state argues the decision to stipulate to the DNA report was reasonable trial strategy, and appellant has failed to demonstrate prejudice as the jury had the report prepared by Hague.

{¶ 97} At trial, defense counsel represented to the trial court: "I plan on calling Colleen Hague, who is a forensic scientist who did the DNA.  I know we stipulated to it, but I feel * * * it is safest to make sure she identifies that there is no dirt or anything, any other contaminants."  (Tr. Vol. III at 477.)  The trial court observed that "she is just going to testify as to what she did."  (Tr. Vol. III at 478.)  Defense counsel agreed: "Obviously, yes, that would be her testimony, that she did run the tests."  (Tr. Vol. III at 478.)  The trial court then inquired of counsel: "But didn't you stipulate to it?"  (Tr. Vol. III at 478.) Counsel responded: "Yeah.  Just belt and suspenders, Your Honor."  (Tr. Vol. III at 478.)

{¶ 98} On appeal, appellant does not suggest what testimony Hague would have provided that was not already before the jury in the stipulated-to report (State's Ex. H-1). Under Ohio law, the "[f]ailure to put on cumulative evidence is not indicative of ineffective assistance of counsel."  *State v. Johnson,* 2d Dist. No. 16803 (Aug. 7, 1998), citing *State v. Combs,* 100 Ohio App.3d 90 (1st Dist.1994).  Here, appellant cannot show counsel was ineffective in failing to present cumulative evidence.  Based on this court's review, appellant has demonstrated neither deficient performance nor prejudice based on counsel's decision to stipulate to the report at issue.

{¶ 99} Under his seventh claim of ineffective assistance of counsel, appellant cites to an inquiry by his trial counsel at the end of appellant's direct examination, in which counsel asked appellant: "[I]s there anything I have left out or anything you want the jury to know that I might have missed in speaking to you and asking you questions today?" (Tr. Vol. III at 516.)  The record indicates the state objected, and the trial court sustained

the objection. Again, appellant has failed to demonstrate (or even explain) how this unanswered question prejudiced him.

{¶ 100} Appellant next cites ineffective assistance as a result of his counsel's failure to object when the trial court indicated it would not be instructing on lesser-included offenses. We have previously found, however, in addressing appellant's second assignment of error, that the trial court did not err in failing to instruct on the lesser-included (or inferior degree) offenses of voluntary and involuntary manslaughter. Accordingly, trial counsel's failure to object to the trial court's ruling on this issue implicates neither deficient representation nor prejudice.

{¶ 101} Appellant also asserts his counsel was ineffective in asking the court to "refresh" counsel's memory regarding Evid.R. 404(A)(1) and 608. This request was made in the context of defense counsel indicating he would be calling a character witness (Daniel Baker). As noted by the state, however, this inquiry was not made in front of the jury, and the record indicates appellant was permitted to call the witness at issue. The state also contends defense counsel's failure to recall which rule applied during the pressure of trial does not demonstrate deficient performance, and the record does not demonstrate any prejudice. We agree and find neither deficient performance nor prejudice with respect to this claim.

{¶ 102} Appellant's final claim of ineffective assistance of counsel involves a document signed by Hague, the forensic scientist (titled "written stipulation of Colleen Hague"). Appellant notes trial counsel requested the document be submitted into evidence, but the trial court denied the request.

{¶ 103} The record indicates the trial court deemed the document sought to be admitted as "just cumulative." (Tr. Vol. IV at 577.) On appeal, appellant acknowledges that the document was "just a summary of the report already in evidence." (Appellant's Brief at 34.) In this respect, as noted by the state, Hague's DNA report was submitted to the jury (as State's Ex. H-1). Again, appellant has failed to show any prejudice where the evidence at issue was cumulative of evidence already before the jury.

{¶ 104} Appellant also contends he was denied a fair trial based on the cumulative effect of the above claims. We disagree.

{¶ 105} Under Ohio law, "[a]lthough a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives appellant of a fair trial, despite the fact that each error individually does not constitute cause for reversal." *State v. Givens*, 7th Dist. No. 07 CO 31, 2008-Ohio-3434, ¶ 97, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. The doctrine of cumulative error, however, "is not applicable where appellant fails to establish multiple instances of harmless error during the course of the trial." *Id.,* citing *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). Further, a defendant claiming cumulative error "must make 'a persuasive showing of cumulative error.' " *Id.,* quoting *State v. Sanders*, 92 Ohio St.3d 245, 279 (2001).

{¶ 106} In the present case, appellant has failed to establish multiple instances of harmless error and, therefore, the doctrine of cumulative error is not applicable. In light of the foregoing, and having failed to demonstrate deficient performance or actual prejudice with respect to the above ten claims, appellant's third and fourth assignments of error are overruled.

{¶ 107} Appellant's fifth and sixth assignments of error are interrelated and will be considered together. Under the fifth assignment of error, appellant contends the trial court erred in overruling his Crim.R. 29 motion for judgment of acquittal. Under the sixth assignment of error, appellant contends his conviction is against the manifest weight of the evidence.

{¶ 108} Under Ohio law, "[a] motion for judgment of acquittal, pursuant to Crim.R. 29, tests the sufficiency of the evidence." *State v. Darrington,* 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15. Thus, "an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim." *Id.* In considering a sufficiency claim, "[t]he evidence is construed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt." *State v. Jewett,* 10th Dist. No. 11AP-1028, 2013-Ohio-1246, ¶ 15.

{¶ 109} By contrast, in considering whether a conviction is against the manifest weight of the evidence, the task of an appellate court is to "review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses."

*State v. Bandy,* 1st Dist. No. C-160402, 2017-Ohio-5593, ¶ 55, citing *State v. Thompson,* 78 Ohio St.3d 380, 387 (1997). The issue in "reviewing such a claim is whether in resolving conflicts in the evidence, and in rejecting [a defendant's] defenses, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *Id.*, citing *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 110} As noted, the jury returned a verdict finding appellant guilty of felony murder as charged in Count 2 of the indictment (i.e., as a proximate result of committing the predicate offense of felonious assault). R.C. 2903.02(B) states in part: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2903.11(A)(2) defines felonious assault in part as follows: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon."

{¶ 111} We initially consider the sufficiency of the evidence. Construing the evidence most strongly in favor of the prosecution, as we are required to do in considering a sufficiency challenge, the record indicates the following evidence. On the date of the incident, Hunter Peterson, Jose Martinez, and John Barnett were driving around in Barnett's vehicle, smoking marijuana. At 2:45 p.m., appellant texted Barnett indicating he had a switchblade knife. The text by appellant stated: "Bring sum witchu to cause this switchblade goin thru your kidney." (Tr. Vol. III at 404.) At 2:57 p.m., appellant texted Barnett to state: "On my way to yah momma house." (Tr. Vol. III at 404.) At approximately 3:30 p.m., appellant sent another text stating: "Ran thru ur yard an almost hadd beat ur neighbor up smh." (Tr. Vol. III at 404.) Barnett also received a phone call from one of his parents indicating that appellant had been to their house, that he had driven in the yard, and that he was acting in a "harassing" manner. (Tr. Vol. II at 188.)

{¶ 112} A short time later, Barnett's vehicle and appellant's vehicle passed each other on Briggs Road. Both vehicles eventually stopped near the intersection of Binns Boulevard and Briggs Road, and appellant and Barnett exited their vehicles. Peterson testified that Barnett and appellant met in the middle of the street and "started throwing punches at each other." (Tr. Vol. II at 197.) Martinez similarly testified that appellant and Barnett "met up in the middle of the road and got to fighting. They were both throwing

fists at each other." (Tr. Vol. II at 248.) Less than 20 seconds into the fight, appellant pulled out a switchblade knife from his jacket and stabbed Barnett twice. Martinez observed appellant "duck down, go in his pocket with his right hand." (Tr. Vol. II at 250.) Appellant "[r]eached into his hoodie pocket" and "[c]ame out with the knife" and stabbed Barnett. (Tr. Vol. II at 251.) The fatal stab wound was four to six inches deep, lacerating Barnett's lung and heart. None of the witnesses, including appellant, observed a weapon on Barnett. Appellant testified that Barnett might have thrown one punch "before I produced the weapon. I didn't wait for the punch to pull the weapon." (Tr. Vol. III at 539.) None of the witnesses heard Barnett make any threats at the time. Appellant acknowledged the only thing he heard Barnett say to him was: "You stabbed me." (Tr. Vol. III at 540.) After appellant stabbed Barnett, the knife fell to the ground. Appellant admitted he picked up the knife before fleeing the scene.

{¶ 113} Appellant acknowledged at trial that he "threatened [Barnett] with a knife" on the date of the incident. (Tr. Vol. III at 488.) He also acknowledged telling police that his "impression" that day was that "we were going to meet up to fight." (Tr. Vol. III at 536.) Both Peterson and Martinez testified appellant was not in danger of serious physical harm at the time of the incident, and photographs taken of appellant one day after the incident revealed no injuries to him.

{¶ 114} As discussed under the first assignment of error, the evidence failed to show appellant was in imminent danger of death or serious bodily harm at the time of the altercation. Rather, the evidence indicated Barnett was unarmed and he swung his fist no more than once before appellant pulled out a switchblade knife and stabbed him in the chest. As also discussed, the evidence indicated appellant responded with deadly force that was not necessary or proportionate to the threat posed, i.e., in response to a single punch thrown by Barnett, appellant introduced a deadly weapon into a fist fight. Viewing the above evidence in a light most favorable to the prosecution, the record established sufficient evidence to support the elements of felony murder beyond a reasonable doubt. Accordingly, the trial court did not err in denying appellant's Crim.R. 29 motion for judgment of acquittal.

{¶ 115} With respect to appellant's manifest weight claim, appellant argues there were inconsistencies in the testimony of the state's primary witnesses, and the evidence

established the affirmative defense of self-defense. Appellant maintains that Peterson and Martinez gave inconsistent testimony regarding whether Barnett initially pursued appellant as they were driving around. Appellant also points to his own testimony that he was pulled from the vehicle.

{¶ 116} In response, the state argues that, despite appellant's claim of inconsistencies in the testimony of Peterson and Martinez, their testimony was remarkably consistent as to the major aspects of the case. The state notes Peterson and Martinez both testified that appellant and Barnett got out of their respective vehicles and that appellant was not dragged from his Jeep; further, both of these witnesses testified Barnett was unarmed.

{¶ 117} In general, a reviewing court must "accord due deference to the credibility determinations made by the fact finder." *State v. Thompson*, 127 Ohio App.3d 511, 529 (8th Dist.1998). Further, under Ohio law, "the mere existence of inconsistencies in the testimony of different witnesses does not mandate that an appellate court reverse a conviction on manifest weight grounds." *State v. Wareham,* 3d Dist. No. 3-12-11, 2013-Ohio-3191, ¶ 24.

{¶ 118} In the present case, the jury had the opportunity to consider the credibility of the state's witnesses, as well as the credibility of appellant's testimony. The trier of fact was not required to credit appellant's version of the events, including his testimony that he only drove to the home of Barnett's parents to "see[] what was the problem" and to "figure[] out the difference." (Tr. Vol. III at 489.) Rather, the jury heard evidence that appellant had earlier texted Barnett to state that he had a switchblade knife and that he was "[o]n my way to yah momma house." (Tr. Vol. III at 404.) The jury was also not required to accept appellant's testimony that he was pulled from his vehicle by Barnett. Both of the state's witnesses contradicted appellant's version, testifying Barnett and appellant willingly met up in the middle of the street and began to throw punches. The state's evidence also showed blood in the middle of the street, consistent with the testimonies of Peterson and Martinez. Finally, the trier of fact heard evidence that appellant informed police he grabbed the knife out of his vehicle, which conflicted with appellant's trial testimony that he pulled the switchblade out of his shirt.

{¶ 119}  Here, it was within the province of the jury to credit the testimony of the state's witnesses that Barnett and appellant met with the intention of engaging in a fist fight.  As previously discussed, the evidence indicates that, within seconds of the altercation, and before Barnett threw more than a single punch, appellant pulled out a switchblade knife and stabbed Barnett twice, including the fatal wound to the chest.  As also discussed, there was no evidence Barnett had a weapon during the altercation, and the credible evidence failed to support a finding that appellant had reasonable grounds for believing there was an imminent threat of death or serious bodily harm.  More significantly, the weight of the evidence simply did not show that the use of deadly force by appellant, who suffered no apparent injury during the altercation, was warranted under the circumstances and proportionate to the perceived threat.  *See State v. Hogg,* 10th Dist. No. 11AP-50, 2011-Ohio-6454, ¶ 39 (conviction for aggravated murder not against the manifest weight of the evidence where evidence established the victim swung his fist at defendant, never actually hitting defendant, and defendant responded by fatally stabbing the unarmed victim).  Based on this court's review of the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we conclude the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶ 120}  Accordingly, appellant's conviction was not against the manifest weight of the evidence.  Further, having found the trial court did not err in denying appellant's motion for judgment of acquittal, the fifth and sixth assignment of error are overruled.

{¶ 121}  Based on the foregoing, appellant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs.
BRUNNER, J., dissents.

BRUNNER, J., dissenting.

{¶ 122}  I concur with the majority that there was insufficient basis for instructing the jury on voluntary manslaughter, and thus I would overrule Nicholas Kean's second assignment of error.  But on Kean's first assignment of error, I respectfully dissent from the opinion of the majority.  I would sustain Kean's first assignment of error, finding that

the trial court erred in not instructing the jury on the rebuttable presumption of self-defense. I would find moot all other assignments of error and remand to the trial court for a new trial.

{¶ 123} Kean argues in relation to the fact that the jury was not permitted to consider whether he acted in self-defense, that the trial court improperly limited jury instructions when it prohibited the jury from deciding whether John Barnett, the individual Kean stabbed and killed, pulled Kean out of his vehicle. This issue was predicate to a jury finding that Kean acted in self-defense in attempting to protect himself from Barnett's advances. Kean argues that the trial court erred in not providing a rebuttable presumption instruction of self-defense to the jury, because the trial judge found Kean's testimony not credible that he was dragged out of his vehicle. Thus, the jury was not even permitted to decide whether, factually, certain events such as this occurred that would support instructing the jury on self-defense. The State argues the trial court's refusal to so instruct the jury was harmless error, and the majority finds harmless error beyond a reasonable doubt in supporting the trial court's decision to limit instruction. *See* Majority Decision at ¶ 59.

{¶ 124} Kean testified in his own defense. He testified that Barnett had earlier told Kean when they heatedly discussed meeting that Barnett would blow his head off. Kean testified he had previously observed Barnett with a gun. Kean had a knife and in that heated discussion he made threats to Barnett about what he would do with it to Barnett. The majority finds that "no rational jury could have found appellant's use of a knife under the facts and circumstances of this case was reasonably necessary and proportionate to the danger presented." *Id.*

{¶ 125} On cross-examination, Kean stated he did not observe Barnett with a weapon during the incident and he also stated he "couldn't see if [Barnett] had [a weapon] at that very moment." (Tr. Vol. III at 511.) While determining the existence of a valid argument that the accused acted in self-defense involves three factors, if there is conflicting evidence as to one such factor, the jury, not the trial court, should decide whether or not a criminal defendant acted in self-defense. The trial court made an impermissible credibility determination and effectively denied Kean the right to have the jury consider whether Kean acted in self-defense. It disregarded Kean's testimony

that raised questions about whether Barnett had a weapon, characterizing it as self-serving. The majority opinion is constructed on a variety of cases from other districts that, taken together, reach this "inescapable conclusion" to support affirming the trial court.

{¶ 126} This Court has long stated, "[i]t is basic that the weight to be given evidence and the weighing of credibility of the witnesses is for the trier of fact." *State v. Kirksey*, 10th Dist. No. 91AP-798, 1992 WL 55447, 1992 Ohio App. LEXIS 1282, *5-6 (Mar. 19, 1992), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). In *Kirksey*, the facts were very similar to what they are in Kean's case. The record revealed that the defendant's version of the facts "was directly at odds with that of his two companions and his mother." *Id.* at *5. Critically, we stated, "there was no evidence other than the self-serving testimony of defendant, that the victim may have had a knife in his possession at the time of the shooting" and "while none of the witnesses in this case (except defendant) saw the victim with a knife, a knife was later observed on the floor near the couch by defendant's two companions. And a pair of safety scissors was found under the body of the victim upon examination by detectives." *Id.* We concluded: "It is obvious the jury rejected defendant's unsupported plea of self-defense and properly decided between competing alternatives as to the appropriate degree of offense found to have been committed by the defendant." *Id.*

{¶ 127} In *Kirksey,* while we characterized the defendant's testimony in his own defense and in conflict with that of other witnesses as "self-serving," we never said that the jury should not have been permitted to decide whether he acted in self-defense based on that testimony. Rather, we followed Supreme Court of Ohio precedent that the credibility determination and judging of the weight of the evidence belonged solely to the jury.

{¶ 128} Here, in Kean's case, he was denied the opportunity to have a jury determine whether he acted in self-defense. In Kean and Barnett's situation, the weapons—gun versus knife—were reversed from the facts in *Kirksey,* where defendant had the gun while the victim was argued to have the knife.

{¶ 129} The majority need not have gone outside our appellate district to apply the law or even to find facts not nearly as strikingly similar to Kean's case. I am gravely

concerned that we are headed on a dangerous course when we permit the trial court to weigh credibility to determine whether the jury should be instructed on a matter as basic to a fair trial as whether a criminal defendant acted in self-defense. Worse, I hold grave concerns when we find that a matter as serious as making credibility determinations when such is the province of the jury is harmless error. Kean alleged in his first assignment of error both federal and state constitutional violations. I agree that such violations were committed and that he was denied a fair trial. I would find the trial court abused its discretion in failing to instruct the jury so as to permit the question of whether Kean acted in self-defense to be determined by the jury rather than the trial judge. I would sustain Kean's first assignment of error, reverse, and remand the case for a new trial. I would overrule Kean's second assignment of error and find moot the other assignments of error he has raised on appeal.

_____